JOHN J. HARVEY AND IRMA P. HARVEY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67596. Filed September 30, 1959.

[3] See section 117(a) of the Internal Revenue Code of 1939 and section 1221 of the Internal Revenue Code of 1954.

*A. Calder Mackay, Esq.,* and *Charles J. Higson, Esq.,* for the petitioners.

*Eugene F. Reardon, Esq., Leo K. O'Brien, Esq.,* and *R. E. Maiden, Jr., Esq.,* for the respondent.

OPINION.

HARRON, *Judge:* During the taxable year 1953, the petitioner's employer paid him $2,315, at the rate of $7 per day, in addition to his regular salary. The question is whether this sum is additional compensation for services and, therefore, income under section 22(a) of the 1939 Code, or reimbursement for "traveling expenses while away from home" within the provisions of sections 23(a)(1)(A) [1] and 22(n)

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions:
(a) EXPENSES.—
   (1) TRADE OR BUSINESS EXPENSES.—
     (A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; * * *

(2).[2] Petitioner seeks to subtract from gross income the amount of $2,315, but such subtraction from gross income is allowable only if the amount would be deductible as traveling expenses under section 23(a)(1)(A). Both parties rely upon the principles stated in *Commissioner* v. *Flowers*, 326 U.S. 465.

It was stated in the *Flowers* case that three conditions must be satisfied before a traveling expense deduction may be allowed under section 23(a)(1)(A), and that "[f]ailure to satisfy any one of the three conditions destroys the traveling expense deduction." The three conditions noted by the Supreme Court are as follows:

(1) The expense must be a reasonable and necessary traveling expense, as that term is generally understood. This includes such items as transportation fares and food and lodging expenses incurred while traveling.

(2) The expense must be incurred "while away from home."

(3) The expense must be incurred in pursuit of business. This means that there must be a direct connection between the expenditure and the carrying on of the trade or business of the taxpayer or of his employer. Moreover, such an expenditure must be necessary or appropriate to the development and pursuit of the business or trade.

It was also said in the *Flowers* case that "[w]hether particular expenditures fulfill these three conditions so as to entitle a taxpayer to a deduction is purely a question of fact in most instances"; that in order to be deductible the "travel expenses" must be required by *"the exigencies of business"; and that "[b]usiness trips are to be identified in relation to business demands and the traveler's business headquarters."* See, also, *Peurifoy* v. *Commissioner*, 358 U.S. 59.

The respondent's determination has been made on a broad basis in that he has held that $2,315 is income under section 22(a) and that it is not "away from home" expenses under sections 23(a)(1)(A) and 22(n)(2). The petitioner has the burden of proving that the determination is incorrect. The issue to be decided presents a question of fact.

By a stipulation,[3] the parties have eliminated questions relating to the nature and amounts of the particular items of expense which aggregated $2,315. The record does not disclose the types and amounts of the individual expenses. It is assumed, however, that expenses

---

[2] SEC. 22.(n) DEFINITION OF "ADJUSTED GROSS INCOME".—As used in this chapter the term "adjusted gross income" means the gross income minus—

\*　　　\*　　　\*　　　\*　　　\*　　　\*

(2) EXPENSES OF TRAVEL AND LODGING IN CONNECTION WITH EMPLOYMENT.—The deductions allowed by section 23 which consist of expenses of travel, meals, and lodging while away from home, paid or incurred by the taxpayer in connection with the performance by him of services as an employee;

[3] The parties have stipulated as follows:

"If it is determined that petitioner husband was away from home while employed at Edwards Air Force Base, California, during the year 1953, then his away-from home expenses, (including the amount expended for meals and lodging) under Section 22(n)(2) of the Internal Revenue Code of 1939, at this location amounted to $7 per day or a total of $2,315.00."

for meals and lodging at the base and in Lancaster are included. If there are included in the total amount petitioner's expenses of going to and from his work at the base in making daily trips between Lancaster and the base and the cost of taking trips to visit his family in Santa Monica over weekends, the record does not show anything about such expenses.

Respondent contends that beginning on December 15, 1952, petitioner acquired a new headquarters, or post of duty, principal and regular place of employment, which was at Edwards Base; that Edwards Base was petitioner's headquarters and post of duty until around the end of January 1954; that the so-called per diem paid by Douglas Aircraft during the entire period was additional pay to compensate for additional personal expenses which were entailed by petitioner's having to work at Edwards Base; that the base was not a transitory and temporary location of operations of Douglas Aircraft; that the procedure of Douglas in assigning petitioner to Edwards Base by means of a so-called travel order, which was renewed periodically, was nothing more than an administrative procedure of Douglas under its general policy of issuing travel orders to every employee who was assigned to work at Edwards; and that the fact that Douglas issued travel order forms to petitioner and paid him the stipend of $7 per day as "travel expenses" is not determinative of the question to be decided.

The petitioner contends that Santa Monica was his headquarters and post of duty and principal place of employment; that Douglas Aircraft determined that petitioner's assignment to Edwards was a temporary one with respect to the acceptance of which petitioner had no discretion; that the employer's issuance to petitioner of an initial 90-day travel order, subject to extensions for 90 days, is evidence of the temporary nature of petitioner's assignment to the base; that Douglas Aircraft's determination that petitioner's assignment to the base was temporary and that he was in travel status during the entire time that he was there was reasonable, was in accord with sound business practice, and was also in accord with policies of the Air Force; that the exigencies of Douglas Aircraft's business required the "travel"; and that it cannot be held that Edwards Base was petitioner's headquarters and post of duty during 1953 because he was not permanently assigned to the base.

Petitioner adopts the view that a proper construction of the word "home" in the statute is the taxpayer's "place of business, employment, or the post or station at which he is employed, in the prosecution, conduct, and carrying on of a trade or business," as was stated in *Mort L. Bixler*, 5 B.T.A. 1181, 1184, and also followed in *Barnhill* v. *Commissioner*, 148 F. 2d 913. Respondent also adopts that view.

Petitioner objects to respondent's position that whether the situs of

a taxpayer's work constitutes his post of duty and regular place of employment may be determined on the basis of whether at the time the work is undertaken at such location the employment there was to be for an indefinite and indeterminate period. Petitioner argues that the determination of whether a particular place of employment constitutes a post of duty depends upon whether the assignment to such locus of employment was permanent; that if an employee is not permanently assigned to a situs of work, then the assignment must be held to have been temporary; and that if an assignment to a work location is temporary, even though it is indefinite and indeterminate, then such work location is not the employee's headquarters and post of duty, and while he works under a "temporary" assignment he is "away" from his post of duty located elsewhere. Petitioner argues, further, that when an assignment of an employee to a particular situs of work is made because of the exigencies of the employer's business, the expenses incurred by the employee while there are deductible as "traveling expenses while away from home" within the requirements of the statute.

The contentions of each party and the entire record have been very carefully considered, and particular attention has been given to all of the standards which the Supreme Court has delineated in the *Flowers* and *Peurifoy* cases as the proper standards to be applied in determining whether expenses are deductible under section 23(a)(1) (A). It is recognized that in this case the petitioner is a regular employee of a corporation who, in 1952, had been an employee for over 12 years and is still an employee of the corporation, that there are differences in the facts and situations in both the *Flowers* and *Peurifoy* cases as compared to the facts here, and that here the employer paid an amount to the employee which is said to be reimbursement for expenses whereas in the cited cases no payments were made by the respective employers to cover alleged "traveling expenses."

Our conclusion is that the petitioner has failed to establish that the expenses in question satisfy the three conditions contained in section 23(a)(1)(A). We turn now to discussion of the evidence and the reasons for our conclusion.

A preliminary matter should be noted. It is axiomatic that each case stands on its own particular facts. Before us in this case is John J. Harvey, only. In the record there is material dealing with and explaining, in general, policies of Douglas Aircraft relating to the organization of its operations on the basis of projects, and dealing with the issuance of so-called travel orders and the hazards which may occur during the course of its operations. Although the entire record has been considered, we have attempted to distinguish and give due weight to that which is relevant to the taxpayer before us.

The petitioner would have us believe that *all* of the work carried on by Douglas Aircraft at Edwards Base is of a transient nature, and that it cannot be said that the base could be a headquarters or post of duty of any employee of Douglas. The evidence does not support such generalizations. The record shows that ordinarily the testing operations to be carried on at the base and the time which it is expected will be required are planned in advance; that some testing work there has required 1 or 2 years, or longer; and that some employees have worked at the base for 1 or 2 years, or more. Douglas has carried on regularly certain work, chiefly flight testing, at the base since 1947 until the present time under contracts with the Government which require its doing certain work at the base. Certain facilities and hangars there have been used by Douglas to which it has made additions at its own expense, and over the years the facilities used by Douglas have increased. Eventually, in 1955 (according to the Douglas Travel Manual), Douglas classified Edwards Base as one of its "permanent" locations for carrying on some of its operations. In 1952 and 1953, Douglas kept a few maintenance employees there continuously, foremen and toolkeepers, and other employees (the number of which is not shown) were located there for 2 or 3 years, or longer. It appears that Douglas had a substantial number of Government contracts during the period involved here which required a regular course of operations at the base. With respect to the organization of work on a project basis and the assignment of several types of workers to a project so that parts of the entire project job were performed at a plant in the Los Angeles area and other parts of the entire project were worked on at Edwards Base, it is our opinion, based upon the entire record, that the work under a project which was done at Edwards in some instances was so substantial and continuous that it was a distinct subdivision of the project work and was apart from other phases of the work which had to be done at one of the plants owned by Douglas. Our conclusion is, therefore, that during the years 1952–1954, at least, it was possible and practicable for Edwards Base to be a headquarters or post of duty of some employees of Douglas, and that it cannot be said that the only places where any employee could have a post of duty was at a plant owned by Douglas. There is testimony that before 1953 Douglas considered the possibility of establishing a new center for flight testing away from Edwards Base. It did not do so and that testimony is, in general, immaterial and irrelevant.

The policy and practice of Douglas in issuing so-called travel orders, limited to 3 months (or 90 days), to all employees assigned to work at Edwards Base, and its practice of paying a so-called per diem of $7 to every employee who worked there (except those hired from the locality) are general matters which require some comment. Although the record lacks testimony of representatives of the Air Force in its con-

tracting and auditing departments, there is testimony of an officer of Douglas Aircraft which clearly shows that the policy and practice of Douglas in issuing the so-called travel orders was discussed with the appropriate officers of the Air Force so that the expense to Douglas of paying $7 per day to employees assigned to Edwards, in addition to their regular wages, would be recognized by the Air Force and Navy as the kind of expense for which the Government would make reimbursement to Douglas. In order that such per diem expense of Douglas could be included in its reimbursable expenses, it was necessary that there would be compliance with regulations relating to the reimbursement of travel expenses in the Armed Services Procurement Regulations. The record does not show, however, what those regulations are. The petitioner has explained only partially the relationship, if any, of the policy of Douglas in limiting all travel orders to 90 days, subject to extensions for 90-day periods, to ASPR. For example, we are not told whether the Air Force regulations limited its classification of what constitutes reimbursable travel expense to "travel" authorized for a period not to exceed 90 days. Since the Air Force and the Navy have reimbursed Douglas for all the per diem expenses of employees working at Edwards, "booked as such," and since (according to the Travel Manual of Douglas) special arrangements had been established for extensions of the 90-day travel orders in cases of "extended assignments" to Edwards Base, an inference which we think reasonably can be drawn is that the use of travel orders limited to 90 days served certain administrative purposes and objectives of Douglas Aircraft other than a procedure to cover only business trips of employees as that term is ordinarily understood. It is our view, therefore, that in the case of the taxpayer before us it is not necessarily determinative of the issue to be decided that he was under so-called travel orders and was classified by Douglas as being in travel status during the 13½ months he worked at Edwards Base. In some other case having different facts, the fact that a travel order was issued might be given more weight.

With respect to the general policy of paying $7 per day to every employee who worked at Edwards (other than those hired locally) there is testimony of an assistant foreman of field operations in the Testing Division at the Santa Monica plant to the effect that in 1952 and 1953, employees of Douglas would not have been inclined to accept work at Edwards Base without receiving $7 per day in addition to regular wages, and that Douglas adopted the general policy of paying the additional amount per day in order to compensate employees working at Edwards for the additional expenses entailed by working there, particularly if an employee's family continued to reside in the Los Angeles area while he was employed at the base. The same witness testified that the Testing Division made up in

advance schedules covering the testing operations to be done on a project at Edwards and that in some instances it was anticipated at the time an employee was assigned to do work at Edwards that he would be required to work there for more than 90 days under normal operations, excluding emergencies, but in every instance the travel order was issued for only 90 days.

The record shows that Douglas paid employees working at Edwards Base the additional stipend of $7 per day during the entire periods they were there, whether for a month or for more than a year, even if the employees established a family residence in the vicinity of the base to which their families moved, and that although Douglas knew of instances where employees moved their families to a town near the base, that fact did not cause termination of the payment of $7 per day in addition to regular wages. Petitioner continued to receive that payment after his family moved to Lancaster. Whether or not his employer knew that he moved his family to Lancaster, its policy was to continue paying the so-called per diem.

It is frequently the rule in considering tax questions that terminology, labels, form, and accounting procedures are not determinative of the question. That rule applies here in connection with the issuance of a so-called travel order to petitioner and the designation of "travel expense" reimbursement given to the amount per day which he received. Upon the entire record the procedure followed by Douglas and its designations are not determinative in this case.

The basis of petitioner's claim that the sum he received, $2,315, constitutes traveling expenses under section 23(a)(1)(A) is that during the entire time he was at Edwards Base he was in travel status away from a principal post of duty at Santa Monica. The chief question is whether his headquarters and principal post of duty shifted to Edwards Base when he received a new work assignment.

During the period petitioner worked at the base, he did not do any work at any time at the Santa Monica plant. He did not take any business trips away from the base. All of his duties were carried out there. Prior to going to the base, petitioner worked at the Santa Monica plant for not more than 30 days, the work he did during that interval did not relate to the X–3 airplane testing project, and the work which he did at the base represented a new work assignment. Petitioner did not accompany the X–3 plane to the base; it was there when he arrived. Petitioner had worked previously at the El Segundo plant for 12 years. Compared to the work he did there, the work he did at the base was new.

When petitioner was assigned to the base in 1952 he was not told that the assignment away from the Santa Monica plant was either strictly temporary or that it would be for a period which would end within a

foreseeable length of time, or at the end of 3 months. In fact, the petitioner received a year-round assignment in which his new work was not tied to any work which he had been doing at either the El Segundo or the Santa Monica plant. His supervisor was noncommittal when making the assignment. He gave no assurance about the foreseeable termination thereof but merely indicated that petitioner was to work at the base for as long as he was needed there. Under all of the facts and circumstances we are unable to find and conclude that petitioner's job at Edwards Base was so temporary that the rule of the *Flowers* case does not apply. We are unable to find that during the period involved petitioner had his headquarters and principal post of duty at the Santa Monica plant. The facts, in our opinion, support a finding that petitioner's headquarters and principal post of duty shifted to Edwards Base, his new place of employment.

It was said in the *Flowers* case that "[b]usiness trips are to be identified in relation to business demands *and the traveler's headquarters.*" (Emphasis added.) It is true that the requirements of the business of Douglas Aircraft were the occasion for its assigning petitioner to do work at Edwards but that fact alone is not determinative. Neither is it determinative of the question that the headquarters of the Testing Division is at the Santa Monica plant, that petitioner's employer classified petitioner's assignment to the base as "temporary," and that if an accident to or defects in the X–3 plane had caused a return of the plane to the Santa Monica plant, petitioner's work at the base might have ended and he then would have been transferred back to Santa Monica.

In *Kermit L. Claunch*, 29 T.C. 1047, 1052, affd. 264 F. 2d 309, Claunch contended that because his union had the power to call him off his job at Rome, Georgia (where he worked for 2 years), and send him to another place, his post of duty was not Rome. We rejected the argument and held that the place where Claunch worked was his post of duty, and noted that even though such eventuality might have happened, it did not. We make the same observation here. The fact is that the testing of the X–3 plane continued and petitioner worked at the base for over a year. See, also, *Beatrice H. Albert*, 13 T.C. 129. The argument is immaterial.

In *Henry C. Warren*, 13 T.C. 205, a United States Navy Yard classified Warren's position at the Charleston Navy Yard as "temporary" although he worked there continuously from August 24, 1943, until September 21, 1945, and his duties there did not require him to leave Charleston at any time. We held that Charleston was his post of duty during the taxable year 1944 and denied a deduction for his expenses there under section 23(a)(1)(A). In *John D.*

*Johnson*, 8 T.C. 303, we held that Johnson's post of duty shifted from his employer's main office in Cleveland to its office in New York City. He had worked in the Cleveland office for 24 years and was transferred to New York City to take the place of the sales manager who had been given a leave of absence to enter the service in the Navy. It was understood that when the absent sales manager came back, Johnson would return to the Cleveland office but it was not known when that would be. It was held that Johnson's expenses for meals and lodging in New York City during an entire year were not traveling expenses.

In *Darrell Spear Courtney*, 32 T.C. 334, the facts closely resemble the facts here. Courtney was employed by North American Aviation, Inc., which has its main plant near Los Angeles at Downey. It was required under a Government contract to do testing work at Edwards Base. Courtney had worked at the Downey plant since October 1951. He was assigned to do work at Edwards in July 1952 which involved making records of the tests. He was not told how long he would be employed at the base. He worked there until March 1954. North American classified Courtney's assignment to the base, as well as the entire testing project, as temporary. We did not regard the employer's classification of the assignment as determinative and held that Courtney's headquarters and principal post of duty shifted from the Downey plant to Edwards Base.

This case is not distinguishable from the *Courtney* case. The facts here are substantially the same. In some respects they are even less favorable to the taxpayer. Also, although North American did not use so-called travel orders in assigning its employees to Edwards Base, it paid employees who were transferred from the Downey plant a "per diem" during the entire time they worked at the base. As noted above, we are unable to attach a great deal of significance to the fact that Douglas Aircraft issued 90-day travel orders to all of its employees who worked at the base, and such factor does not serve to distinguish this case from Courtney's. Courtney's so-called per diem receipts in 1953 aggregated $2,443 and were based upon an allowance of $7 per day after an increase from a lower amount. Petitioner's allowances during 1953 totaled $2,315. Courtney moved his family to Lancaster about 6 months after he began work at Edwards, as did petitioner. The exigencies of the employer's business in both cases required the transfers of the respective employees to Edwards. We are unable to find facts here which would support the conclusion that the Santa Monica plant continued to be the post of duty of Harvey, just as we were unable to find under substantially the same type of facts that the Downey plant continued to be the post of duty of Courtney.

Much of what was said in the *Courtney* case and the cases there cited apply here. See *York* v. *Commissioner*, 160 F. 2d 385; *Ney* v. *United States*, 171 F. 2d 449, certiorari denied 336 U.S. 967; *Ford* v. *Commissioner*, 227 F. 2d 297; and *Michael J. Carroll*, 20 T.C. 382. But in addition, it must be held that, without any question, the part of the expenses for meals and lodging out of $2,315 which applies to the period following the move of petitioner's family to Lancaster is not business travel expense but is nondeductible personal expense. *Gunnar Van Rosen*, 17 T.C. 834. "The Congress undoubtedly intended that the taxpayer's personal expenditures in maintaining his usual place of abode should not be deducted * * *." *Chester D. Griesemer*, 10 B.T.A. 386, 389. After petitioner moved into his own house at Lancaster and gave up the one in Santa Monica, he was not burdened, because of his employment at the base, with a duplication of both the household expenses of his place of abode and "outside" expenses. Although there is little or no record of legislative history to explain the intent of Congress in enacting sections 23(a)(1)(A) and 24(a)(1), it appears that the purpose of allowing deduction for living expenses "while away from home" to the extent that they are ordinary and necessary expenses of business travel, was to equalize the burden between the taxpayer whose employment requires business travel and the taxpayer whose employment does not. *James* v. *United States*, 176 F. Supp. 270.

Consideration had been given to petitioner's contention that the expenses in question come within section 23(a)(1)(A) even though it is concluded that his work at Edwards Base was for an "indefinite" rather than a "temporary" period of time, and to the further argument that the base could not have been his principal post of duty because he did not receive a "permanent" assignment there. Petitioner's contentions, if approved, would, in our opinion, enlarge the scope of the relevant provisions of the statute beyond the intent of the Congress. The provisions of section 23(a)(1)(A), allowing a deduction from income upon certain conditions, as a matter of legislative grace, are to be contrasted with the provisions of section 24(a)(1) which disallow any deduction for "personal, living, or family expenses." *Commissioner* v. *Flowers, supra; Gunnar Van Rosen, supra;* and *Darrell Spear Courtney, supra.* "Exemptions from taxation are not to be enlarged by implication if doubts are nicely balanced." *Trotter* v. *Tennessee*, 290 U.S. 354.

It is well established that within the statutory framework of sections 22(a), 23(a)(1)(A), and 24(a)(1), expenses incurred by an employee for meals and lodging at his principal post of duty are not deductible, and that in order for such expenses to be deductible as an expense of business travel they must be incurred while the taxpayer is temporarily living and working away from his headquarters, post

of duty, and "home." *Commissioner* v. *Flowers, supra.* The now-prevailing view is that the expenses of meals and lodging at the place of the taxpayer's employment are not an ordinary and necessary business travel expense "within the meaning of section 23(a)(1)(A) if the employment is of substantial or indefinite duration." *Commissioner* v. *Peurifoy*, 254 F. 2d 483, 487, affd. 358 U.S. 59; *Andrews* v. *Commissioner*, 179 F. 2d 502, 504; *Beatrice H. Albert, supra; James R. Whitaker*, 24 T.C. 750, 753; *Arnold P. Bark*, 6 T.C. 851; *Henry C. Warren, supra; Michael J. Carroll, supra* at 384; and *Kermit L. Claunch, supra* at 1052. It is also the generally accepted interpretation of "temporary" employment that its termination can be foreseen within a fixed or reasonably short period of time. We find no sound reason here for departing from the above views. See, also, *Carragan* v. *Commissioner*, 197 F. 2d 246, 249, where, in applying the same principles in a somewhat different way, it was said: "We see no merit to petitioner's argument that his job was so temporary—i.e., 'for the duration'—that the Flowers rule is inapplicable."

It is held that petitioner's employment at Edwards Base was "indefinite" in duration rather than "temporary" since it could not be foreseen that termination would occur within a fixed or reasonably short period; that the base was his headquarters and principal post of duty during the taxable year 1953; that expenses in the amount of $2,315 were not business travel expenses "while away from home" within the provisions of section 23(a)(1)(A); that the above amount may not be subtracted from gross income under section 22(n)(2); that the amount in question constituted additional compensation for petitioner's services; and that the expenses involved were nondeductible personal and living expenses and not business expenses.

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

FORRESTER, *J.*, dissenting: In view of the facts here involved I feel that the decision of the majority approaches a rule that every worker carries his statutory home on his back as he is moved from one work situs to another by his employer.

All cases involving the allowance of "away from home" expenses involve essentially fact considerations. My only particular quarrel with the findings of the majority is with their ultimate findings; nevertheless, for better exposition of my position, I shall restate the facts.

### FINDINGS OF FACT.

The stipulated facts are so found.

Petitioners have been husband and wife at all times material. They filed a joint income tax return on the cash basis for the calendar year

1953 with the director of internal revenue at Los Angeles, California. Irma P. Harvey is a party to this proceeding solely by virtue of the filing of a joint return, and John J. Harvey will hereinafter be referred to as the petitioner.

The Douglas Aircraft Company, Inc. (hereinafter called Douglas), has manufacturing plants at Long Beach, El Segundo, and Santa Monica, all in the Los Angeles metropolitan area, and in 1953 it employed approximately 55,000 persons there. A Testing Division, charged with the duty of flight testing all company products, has administrative headquarters and central offices in Santa Monica. In 1953 Douglas employed about 17,000 persons in its Santa Monica plant. Most of the personnel of the Testing Division who are assigned to flight testing projects are mechanics, electricians, and technicians, who are rarely if ever required to fly in the planes undergoing tests.

In 1953 company policy was to centralize flight testing at Santa Monica. Test personnel were assigned from that office to various projects and duties. Tests were carried on at various locations both in and out of the Los Angeles area.

High-speed jet aircraft began to appear significantly in the late 1940's, with flight speeds in excess of the speed of sound at least as early as 1947. Thereafter, various technical, safety, and other considerations began to reduce the value of metropolitan centers such as the Los Angeles area as sites for flight testing, and created an increasing need for large, sparsely populated locations.

In 1947 or earlier, Douglas began work on airplanes which were capable of speeds up to that of sound, and on aircraft which subsequently reached supersonic speeds. However, no Douglas plane exceeded sonic speed in actual flight, until the early 1950's.

Edwards Air Force Base (hereinafter called Edwards) is situated slightly in excess of 100 miles from Los Angeles. It is in a relatively dry area, and stands on the borders of a dry lake-bed approximately 5 miles wide by 12 miles long. It has good weather conditions for flight testing, a relatively unpopulated area, and suitable facilities for the performance of flight testing with maximum safety.

Counterbalancing the foregoing were some undesirable features of Edwards. Its use took aircraft and test crews away from the main plant. This separation increased the overall complexity of testing operations, especially in coordination, communications, and the return of craft to the plant for additional work.

On at least one occasion, during a strike at El Segundo, a plane scheduled for testing was trucked to Edwards ahead of schedule and there finished. This was quite exceptional, and in the one such instance of record much equipment which would normally have been installed at the factory was deleted. As a result, that particular plane commenced flight 4 months earlier than had been anticipated.

The land and permanent facilities at Edwards were at all times owned by the United States. Douglas and the various other aircraft companies using those facilities did so solely at sufferance of the Government. As a matter of convenience and necessity, Douglas made substantial additions at its own expense to the facilities at Edwards. Any such addition, if a permanent part of the facility, became the property of the United States.

In 1953 a runway 8,000 feet long and a number of test facilities were thus available to contractors, including Douglas, for flight testing.

Prior to 1953 the runway had fallen into disrepair and a master plan was drafted, to be funded by the Government, calling for the enlargement and modernization of these facilities, including a new 15,000-foot runway.

The plan called for the construction of the runway first, with provision for adequate facilities for the various contractors to be made only thereafter. The hangar facilities assigned to Douglas were then quite inadequate, and by late 1953 conditions were such that Douglas doubted its ability to continue to operate at Edwards.

Douglas had long felt its assigned facilities at Edwards were inadequate and from 1950 forward had engaged in an extensive search for a better location. In 1954 an agreement was finally reached between Douglas, the Government, and another contractor to create a joint facility for both contractors convenient to the new runway. This was approved in the latter part of 1954, and Douglas moved into the facility early in 1956.

In 1953 approximately one-fifth of all experimental and prototype craft assigned to the Testing Division was flight tested at Edwards. During the years 1950–1954, Douglas used the Los Angeles International Airport for the flight testing of jet aircraft to an extent approximately equivalent to that at Edwards. Some jet flight testing continued to be done at Los Angeles after 1954.

The number of Douglas employees assigned to Edwards at any one time ranged between 120 and 140 in 1952, and between 134 and 167 in 1953. In 1953 approximately 900 employees in the Testing Division were engaged in flight-testing work similar to that at Edwards. Not until 1955 or 1956 was there a large upturn in the number of testing personnel of Douglas assigned to Edwards.

During the early 1950's and in 1953 Douglas did flight-testing work at the following locations in California: Los Angeles, Edwards, Point Mugu, El Centro, Salton Sea, China Lake (Inyokern), and Palm Springs, and elsewhere, at Patuxent River, Maryland, Holloman Air Force Base, New Mexico, and Tucson, Arizona.

All testing personnel assigned to Edwards in 1953 received $7 per diem payments in addition to their regular salaries, on the ground

that they were in travel status while at Edwards. The propriety of such payments was reviewed by the appropriate military or other governmental authorities in connection with the establishing of proper costs on Government contracts, and the payments have never been disallowed.

All field assignments of Testing Division personnel were by means of travel orders. All temporary travel orders were for 90 days or less, as a matter of company policy, because of the unpredictable duration of such assignments. The 90-day limit served as a control device for reviewing the feasibility of the assignment of a given employee and of continuing to maintain him in a temporary travel status. This method of assignment is used even where Douglas knows or is reasonably certain in advance that an individual will be at Edwards or some other location for a period in excess of 90 days.

Travel in conjunction with a permanent assignment affords benefits unavailable to an employee on temporary assignment, including payment by Douglas of transportation and moving costs for the employee's family and household goods, retransportation rights, and per diem payments, usually limited to 10 days, for the other members of the family as well as for the employee himself. Under the policy in effect at Douglas at all times pertinent hereto, an employee with the Testing Division was deemed to be at his "home" or permanent base when in the Los Angeles area, although Douglas was aware that some employees assigned to Edwards were purchasing homes in that area.

Flight testing of Douglas planes was done on the project basis. An experienced test crew would be assigned to a plane in an early stage of its manufacture in order to become thoroughly familiar with it. This process of familiarization required at least 6 months, and the test crew would normally be assigned to the project 6 months to a year prior to the first flight. The same crew would thereafter remain with the plane wherever it might be sent on its testing program. In 1953 this might typically be to a remote area for initial flight testing, followed by a return to the Los Angeles area for greater proximity to the manufacturing and engineering departments.

The United States Navy has aircraft test facilities at Patuxent River, Maryland, El Centro, California, and China Lake at Inyokern, California. Final structural and aerodynamic testing of all planes ordered by the Navy took place at Patuxent. Testing at Patuxent could require as little as 1 month or as much as 6 to 9 months. The same test crew originally assigned to the plane in Los Angeles would normally accompany it to Maryland for such testing. Willingness to travel away from the home plant was a condition precedent to employment in the Testing Division.

In 1953 the Douglas planes undergoing flight testing at Edwards were principally military craft, and about 85 per cent of these were

for the Navy. Military procurement normally begins with the setting up of a design requirement by the authority in question, seeking given performance objectives. Bids are then submitted and a contract is let. All activity is scheduled in advance, and an estimate made of the time required for each process and test, as well as the time of delivery to the customer. These estimates are confidential, and are not known to employees generally. Ordinarily, barring the unforeseen, a stay of 3 to 6 months would be the expectable length of a stay at Edwards for a given plane assigned there for flight testing.

In actual practice, it is impossible to predict or anticipate all problems encountered in the testing of a plane of advanced design. Powerplant failures and structural changes, *inter alia*, are among the many causes which can and occasionally do lengthen the testing period of a particular craft substantially beyond any advance estimate, while other events, such as a crash, can and have at times, abruptly ended a test program long prior to its expected termination date. Individual Douglas planes have been at Edwards for periods of a few days to several years.

Lancaster, California, is one of the nearest cities to Edwards. Its population at various times has been as follows:

| Year | Population |
|------|-----------|
| 1950 | 3,924 |
| 1953 | 10,530 |
| 1956 | 25,000 |
| 1958 | 29,000 |

Aviation and agriculture are its principal economic bases. Its rapid growth since 1950 has been due in large measure to the expansion in that area of the aviation industry and activities at Edwards. The aircraft industry began to contribute to the growth of the area in 1946 or 1947.

Shortly after final approval of the new, joint facility at Edwards, and in June 1955, Douglas changed its policy and its employees who could be expected to remain there were then permanently assigned. Such personnel were thereafter not deemed to be in travel status by Douglas except when absent from Edwards on temporary duty elsewhere.

Petitioner was first employed by Douglas in 1940 as a radio technician. After working in various capacities, he was transferred in 1952 at his own request to the Testing Division at Santa Monica. Willingness to travel out of the Los Angeles area was essential to such transfer. On December 15, 1952, approximately 1 month after the transfer, he was assigned on 3 days' notice as a technician to a project at Edwards in connection with an experimental jet plane designated the X-3. His job was to receive and record radio impulses from this airplane while it was in flight, known as telemetry.

The X-3 was a purely research craft designed to investigate conditions of extreme high-speed and high-altitude flight. As a result of its extreme design and small wing area it had take-off and landing speeds of about 200 knots. These and other factors made each flight highly speculative and problematic.

Petitioner remained at Edwards throughout 1953. The X-3 project effectively terminated late in 1953, and petitioner returned to the Santa Monica plant in January of 1954.

From December 1952 until approximately October 1953, petitioner roomed first at a hotel and thereafter at two different private residences in Lancaster. His family continued to reside in Santa Monica during this period in a home which petitioner had purchased in 1942.

Sometime in 1950 or 1951, petitioner and two related individuals had purchased 20 acres of land in Lancaster. Petitioner's purpose was to acquire farming property for eventual retirement. Sometime in 1951 the purchasers began to develop the tract for chicken farming. They also hoped that the land would appreciate in value as a result of growth in the area, and thus turn their purchase into a successful speculative real estate investment as well.

Petitioner had no idea of the eventual length of his stay at Edwards when first assigned there. After spending several months apart from his family, he decided to bring them to the area, and commenced construction of a dwelling on part of his land. His family moved into the new residence in the fall of 1953. Petitioner had a daughter of school age, and wanted to arrange the move so as to avoid a transfer in the middle of a school year.

Thereafter, petitioner rented the Santa Monica house on a month-to-month basis. When he returned to the Santa Monica plant in 1954 his family remained in Lancaster.

In 1954 petitioner was assigned to a matter designated the RB-66 seat-ejection project. His entire working time in 1954 was spent in the Los Angeles area with the exception of 67 days at Edwards, including the period in January prior to his release from the X-3 project, and 1 or 2 short trips to China Lake.

Petitioner's expenses for meals and lodging while at Edwards during 1953 are stipulated to have been $2,315. He deducted this amount on his return for that year as expenses while away from home. Respondent has disallowed that deduction on the ground that for tax purposes petitioner's "home" in 1953 was at Edwards.

OPINION.

The issue here is that of deductibility of certain expenditures as traveling expenses incurred while "away from home." In *Mort L. Bixler*, 5 B.T.A. 1181, the then Board of Tax Appeals held that "home" for this purpose meant one's principal post of business or employment,

rather than one's residence. We have consistently adhered to that view, and it has found support elsewhere. *Barnhill* v. *Commissioner*, 148 F. 2d 913 (C.A. 4) ; *Harold R. Johnson*, 17 T.C. 1261; *Arnold P. Bark*, 6 T.C. 851; *Walter M. Priddy*, 43 B.T.A. 18; Rev. Rul. 55–604, 1955–2 C.B. 49. Contra: *Wallace* v. *Commissioner*, 144 F. 2d 407 (C.A. 9), reversing a Memorandum Opinion of this Court.

In *Commissioner* v. *Flowers*, 326 U.S. 465, an attorney residing in Jackson, Mississippi, accepted employment in Mobile, Alabama, but chose to retain his Jackson residence. In denying a deduction for expenses of travel between the two cities and for meals and lodging at Mobile, the Supreme Court laid down three prerequisites to such deduction as follows:

1. The expenditure must be a reasonable and necessary travel expense.

2. It must be incurred while "away from home."

3. There must be a direct connection between the expense and the carrying on of the trade or business of the taxpayer or that of his employer.

The Supreme Court found it unnecessary to define "home" as used in the statute, as it said the third requirement clearly had not been met, holding that the expenses in question were a result not of a trade or business but rather of the taxpayer's personal desire to reside in Jackson.

In the instant proceeding both parties appear to accept the view that "tax home" means principal post of duty. The sole issue is then whether in 1953 petitioner's principal post of duty was at Edwards or in the Los Angeles area. This, in turn, depends upon whether his transfer to Edwards was temporary, or of sufficient permanence to shift his principal post of duty there, and away from the Los Angeles area where it had consistently been in the past.

Both parties cite *Peurifoy* v. *Commissioner*, 358 U.S. 59. There a pipewelder, a welder, and a journeyman plumber undertook employment at a worksite distant from their respective residences. Their habitual method of obtaining employment was to report to the local union in the area where they lived. The union would then inform them of available work, and they would travel to its location at their own expense. They were never employees of the union and became employees of the contractors only when hired at the worksite.

The three taxpayers in *Peurifoy* worked on the jobsite for periods of 20½, 12½, and 8½ months, respectively. The latter two left for personal reasons and the record failed to disclose why the third left, nor did it appear whether further work was unavailable. The project in question appears, however, to have been one of substantial size and duration and to have continued.

The Supreme Court held that under these facts each taxpayer had failed to show that his employment was "temporary" rather than "indefinite" or "indeterminate."

I think the instant case distinguishable. Petitioner did not go to Edwards to obtain employment; he was sent there by his employer of many years' standing. He had a long-established and well-defined "tax home" in the Los Angeles area under any definition of that term, having both resided and worked there.

I think the terms "temporary," "indefinite," and "indeterminate," as well as "permanent," must be defined within the context of the facts and circumstances of each case. An employment or assignment of a given duration may be temporary as to one taxpayer and indefinite or permanent as to another. Taking the instant case as an example, I do not think that an assignment to Edwards on what was virtually a single project which happened to last for approximately 1 year has the same significance in the light of this taxpayer's history that it would have in the case of a taxpayer freshly arrived in the Los Angeles area who had never previously worked for Douglas, or who had no special skill and experience and thinkably could have been easily replaced by one hired locally.

The length of a given assignment, while evidentiary, is not conclusive as to its nature. The initial understanding and expectation of the employer and employee is at least as weighty in that respect as what actually transpired. Compare *Ney* v. *United States*, 171 F. 2d 449 (C.A. 8), certiorari denied 336 U.S. 967; *James R. Whitaker*, 24 T.C. 750; *Michael J. Carroll*, 20 T.C. 382; *Henry C. Warren*, 13 T.C. 205, with *Coburn* v. *Commissioner*, 138 F. 2d 763 (C.A. 2), and *Chester D. Griesemer*, 10 B.T.A. 386. See also *Donald H. Nelson*, 30 T.C. 1151.

Petitioner here had specialized skills and was a longtime career employee of Douglas. He became an employee of the Testing Division with headquarters at Santa Monica, California. He was then sent to, and worked on, a specific project at Edwards, where Douglas had no permanent facilities and where no personnel of petitioner's skills and experience were then assigned other than in connection with such projects. The length of his stay at Edwards was "indefinite" or "indeterminate" only in the sense that its exact duration could not be predicted. *Nonetheless, I believe it was temporary when examined within the context of petitioner's relationship with Douglas.*

Respondent unduly emphasizes petitioner's establishment of a family residence in Lancaster in the fall of 1953. As noted, respondent as well as this Court and most other tribunals which have examined the issue, have rejected the theory that one's family residence is the statutory point of departure for the purposes of the deduction of traveling expenses "away from home." This is true even when a

taxpayer who in fact accepts a permanent assignment at a new location merely retains a long-established residence in the vicinity of his previous principal post of duty.

I think the converse is equally true, and where all the facts show a change of one's post of duty to be temporary, as they do here, the taxpayer's act of changing his family residence to the new work situs cannot alone change such temporary assignment into one that is permanent or indefinite.

While I look upon the location of the family residence as very strong evidence of the location of taxpayer's "home," as that word is used in the statute, I do not believe that this one factor is always decisive in every case. It may create a presumption, but that presumption is rebuttable. If it were not rebuttable it would be a rule of law, and the authorities and even the Commissioner's own current rulings are otherwise.

Section 23(a)(1)(A) allows deduction of expenses for meals and lodging "while away from home." The meaning of the word "home," as thus used, has been the chief question considered in most of the cases decided under this statute and the great weight of authority is that "home" means principal post of business or employment, rather than residence.

The Supreme Court has twice declined to decide this question, in *Commissioner* v. *Flowers, supra,* and *Peurifoy* v. *Commissioner, supra,* although in *Flowers* it effectively made such decision by holding that the maintenance by petitioner of his residence at Jackson was for personal, rather than business reasons.

Since the situs of the family residence does not control when (a) taxpayer's principal post of employment is elsewhere why should it control when (b) taxpayer's principal post of employment is still elsewhere but taxpayer has a temporary post of duty at the same location as his residence? In other words, can we say that in the (a) situation "home" means "business home," but that in the (b) situation it has changed and means "family residence" for that part of the time taxpayer is at his temporary post? The very statement of such a Jekyll-Hyde approach demonstrates that it is unsound. The fact that such a rule would always work against taxpayer and always benefit the Commissioner is further evidence that it is not fair.

Of course, the location of taxpayer's residence is strong evidence of taxpayer's principal post of employment because everyone is inclined to move to such place. But that evidence can be overcome by stronger evidence, and I think was so overcome by the facts in this case. The point is that we are entitled to consider it, i.e., that location of the family residence at Lancaster after October 1953 is *not* all that we are allowed to consider.

This is no novel doctrine. Two recent Revenue rulings directly concern it, as follows:

1. *Rev. Rul. 54–147, 1954–1 C.B. 51,* in considering the case of professional baseball players, managers, etc., reads in part:

It is the well established position of the Internal Revenue Service that the term "home" as used in section 23 (a) (1) (A) of the Code means the taxpayer's principal place of business, post of duty, or place of employment. * * * [Therefore] * * * baseball players * * * are entitled to deduct their traveling expenses * * * when away from the "club town" * * *

\* \* \* \* \* \* \*

In the case of professional baseball personnel who engage in * * * [an additional] business * * * [but] where the "club town" is the taxpayers' principal place of business, such taxpayers are entitled to deduct their traveling expenses * * * while traveling away from their principal place of business, *even though their permanent residence is located at the minor business post.* In the latter case, only that portion of such expenses at his residence which is directly attributable to the taxpayer himself is a deductible expense * * *. [Emphasis added.]

2. *Rev. Rul. 55–604, 1955–2 C.B. 49,* considers the case of an employee having two widely separated posts of duty and who maintains his family residence at his minor or temporary post of duty. It reads in part:

It is now well established that a taxpayer's "home" for traveling expense purposes is located at the place where he conducts his trade or business, unless he is so engaged at two or more distant localities, in which event his "home" is located at his principal or regular post of duty * * *

\* \* \* \* \* \* \*

Accordingly, it is held that an employee having two widely separated posts of duty may deduct the cost of his meals and lodging while his work requires him to be at his minor or temporary post of duty, *even though he maintains his family residence at that location.* In such cases the deduction is limited, of course, to that portion of the family expenses for meals and lodging which is properly attributable to the taxpayer's presence there in the actual performance of his duties. [Emphasis added.]

One facet of respondent's objection to allowance of travel expense deductions to Harvey after he moved his family to Lancaster in October 1953 is that Congress intended to allow a taxpayer to deduct only what his business had cost him—only "what he was out"—and that since he was living at his family residence after October he was not "out" anything.

The position taken in the Revenue Rulings is more realistic. They allow taxpayer only what he is "out," but keep the definition of "home" as "business home" consistent and properly put the burden on taxpayer to prove "that portion of the family expenses for meals and lodging which is properly attributable to the taxpayer's presence there."

In this case we are not concerned with this last question for the parties have stipulated the amount of petitioner's expenses for meals and lodging while at Edwards during 1953.

Certain facts, while not my sole criteria, do deserve special note. In 1953 it appeared that Douglas was about to discontinue the use of Edwards. This had left the stage of mere speculation, and Douglas was overtly taking steps to effectuate this purpose.

Documents introduced into evidence justify the inference that in and around 1953 most assignments to Edwards of testing personnel were in fact for very short periods. And projects of the nature here involved were peculiarly unstable and could and did often end abruptly.

Respondent attacks as "unrealistic" the policy of Douglas of classifying as temporary petitioner's assignment to Edwards. He insists that the sole reason Douglas failed to classify Edwards as a permanent location was the fact that it is a military post. But in 1955, despite its military nature, Edwards was so classified, since by then changes had been made and it was in fact a permanent work situs for Douglas. I do not view as realistic respondent's heavy reliance on hindsight.

I am not unmindful that we have quite recently decided in respondent's favor two cases involving aircraft employees sent to Edwards by other firms which have plants in the Los Angeles area. One such case is *Darrell Spear Courtney*, 32 T.C. 334, and the other an unreported Memorandum Opinion.

The issue before us, however, is peculiarly one of fact, and should be resolved on that basis. *Commissioner* v. *Flowers, supra; Peurifoy* v. *Commissioner, supra.* Important factual distinctions between this case and the *Courtney* case include the following:

1. Courtney was a relatively new employee, without this taxpayer's long history of service in the Los Angeles area for the same employer on whose behalf he went to Edwards.

2. Courtney expected to proceed permanently to Cape Canaveral from Edwards; he did not expect ever to return to work in Los Angeles.

3. The record in the *Courtney* case shows a more significant establishment at Edwards on the part of North American Aviation, Inc., Courtney's employer, including supervisory personnel and an office.

4. The record here affirmatively establishes serious inadequacy and imminent abandonment by Douglas of the use of Edwards in 1953; no such showing was made in the *Courtney* case.

5. Courtney was an office employee not normally expected to change his work situs and thinkably could have been replaced by someone hired locally; whereas this petitioner, as a technical employee in the Testing Division, did in fact expect such changes frequently, with a return to work in the Los Angeles area after each project as well as during projects.

6. Courtney was assigned to Edwards generally, while petitioner was assigned to Santa Monica and was sent to, and worked at Edwards in 1953 on one project.

7. Petitioner here fully expected to do a part of his work on this project at the home plant.

The taxpayer in *Courtney* appeared *pro se*, and it may be that some of the most weighty factual distinctions of record from the case at bar are due to his oversight or to the different degrees of skill with which the taxpayers in the two cases were represented.

On the record in this case, our sole, proper criterion, I would find as a fact that petitioner's principal post of duty in 1953 was in the Los Angeles area, and that he was at Edwards on a temporary assignment. He was therefore "away from home" within the meaning of sections 22(n)(2) and 23(a)(1)(A) of the Internal Revenue Code of 1939, and the determination of a deficiency should be held erroneous.