William M. Kalist, Jr., and Audrey Jane Kalist v. Commissioner.
Kalist v. Commissioner
Docket No. 89900.
United States Tax Court
T.C. Memo 1962-159; 1962 Tax Ct. Memo LEXIS 148; 21 T.C.M. (CCH) 876; T.C.M. (RIA) 62159; June 28, 1962
Ellsworth W. Ginsberg, Esq., for the petitioners. Claude R. Sanders, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the years 1957 and 1958 in the amounts of $682.36 and $773.06, respectively. The issue for decision is whether petitioners are required to include in their gross income amounts of per diem allowances to William M. Kalist, Jr., received during the years 1957 and 1958, and if so, are they *149 entitled to a deduction for these amounts. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, William M. Kalist, Jr. (hereinafter referred to as petitioner, and Audrey Jane Kalist, husband and wife, filed their joint Federal income tax returns for the years 1957 and 1958 with the district director of internal revenue at St. Louis, Missouri. In October 1954 petitioner was employed by McDonnell Aircraft Corporation (hereinafter referred to as McDonnell) as a photographer, and he has been so employed from that time until the present. McDonnell is engaged in the research, development, and production of aircraft, missiles, spact craft, and electronics and automatic computer equipment. Over 99 percent of its business is from defense work under Government contracts. McDonnell carries on its overall operations in an Engineering Division and in a Production Division. The Engineering Division designs, tests, and develops aircraft and missiles, while the Production Division manufactures these airborne weapons for the Government. McDonnell's Production Division carries on its manufacturing operations at McDonnell's only permanent plant in *150 St. Louis, Missouri. The Engineering Division conducts its research and designs and produces prototype aircraft and missiles at McDonnell's only permanent plant in St. Louis, Missouri. The Engineering Division then tests these articles at facilities provided by the Air Force and Navy in accordance with their contracts with McDonnell. McDonnell has conducted testing projects at Holloman Air Force Base (hereinafter referred to as Holloman), New Mexico; Edwards Air Force Base, California; Patuxent River Naval Base, Maryland; and Cape Canaveral, Florida. During the years 1956 through 1960, McDonnell used facilities furnished by the Government for testing purposes at Holloman located near Alamogordo, New Mexico, and these facilities were also used by other aircraft manufacturing companies. McDonnell had a base facility crew at Holloman which employed foremen, tool keepers, timekeepers, and guards. These workers were not assigned to any particular project, and they did general work. In general, the testing performed at Holloman was planned in advance, and the time required for each stage of the work was estimated, but it was not always possible to adhere to such estimates. The number of *151 employees which McDonnell had at Holloman during the period 1956 through 1960 ranged from 50 to 450. In October 1956 McDonnell entered into a contract with the United States Air Force to carry out research and development of an airplane known as the F-101. This contract provided that McDonnell's experimental testing of the craft was to be performed at Holloman. On September 8, 1955, McDonnell entered into a contract with the United States Air Force to conduct research and development projects on a missile known as the GAM-72. The contract required that McDonnell's experimental testing of the missile be performed at facilities furnished by the Air Force at Holloman. Under these two contracts or supplements thereto, Holloman scheduled 12 separate development and testing projects that were carried on at Holloman during the period 1956 through 1960. Both the contract with respect to the F-101 and GAM-72 provided for the Government to reimburse McDonnell for the cost to it of certain amounts it paid to employees for travel and per diem living expenses. The contract provision relative to the payment of these costs read in part as follows: General Provisions Clause 4: (a) For the *152 performance of this contract the Government shall pay to the contractor the costs thereof determined by the Contracting Officer to be allowable in accordance with Part II of Section XV of the Air Force Procurement Regulations as in effect on the date of this contract and the schedule (hereinafter referred to as "allowable costs") plus such fixed fee, if any, as may be provided for in the schedule. * * *
Part VI Additional allowable costs Within the meaning of Clause 4 of the General Provisions of this contract the following costs are deemed allowable in the performance of this contract. * * *
4. Costs for travel and per diem in accordance with the contractor's control procedures accepted by the administrative Contracting Officer. The schedule referred to in Clause 4 of the General Provisions of the contract is a schedule of a specific job or item to be undertaken and sets forth the amounts to be paid therefor. The Armed Services Procurment Regulations in force at the time the contracts for the F-101 and GAM-72 were entered into between the Government and McDonnell provided a general basis for the determination of the allowable direct costs including material, labor, *153 and other direct costs, and allowable indirect costs and contained examples of items of allowable and unallowable costs. Included in the items set out as examples of items of allowable costs was an item entitled, "travel expenses." McDonnell formulated control procedures on travel and relocation policy and on special field assignments which were submitted to the Air Force contracting officer for approval. In the event the contracting officer failed to approve a control procedure, McDonnell revised it to correct the matter to which the contracting officer objected. McDonnell's control procedure 20.100 which provided for travel and relocation policy was approved by the Air Force contracting officer and issued on January 1, 1955. This control procedure was in force at McDonnell during the years here involved. McDonnell's control procedure 20.103 which is entitled, "Travel - Special Field Assignment," was approved by the Air Force contracting officer and issued on January 1, 1955. This control procedure with minor revisions, but in substance unchanged, was in force at McDonnell from the date of its issuance through 1960. McDonnell's policy with respect to the payment of per diem *154 as set forth in control procedure 20.103 provided in part: A. POLICY 1. Individual employees or groups of employees assigned to a single location for any period of 30 days to 9 months, will be subject to the regulations and provisions of this procedure, except when circumstances require special regulations, provisions or exceptions to this policy. * * * C. REGULATIONS 1. No employee may be "assigned" to a single location for any period in excess of 9 months. a. Extension of "assignment" beyond 9 months will require review and additional approval of Vice President, Personnel or his designee. (1) No per diem is authorized in excess of 9 months without such approval. 2. No employee may be "assigned" more than once for the duration of a single project. 3. Employee "assigned" for 60 days or more may take dependents to point of assignment subject to the following: a. Only one round trip for each dependent will be allowed during "assignment". 4. Vacations occurring during assignment * * *
c. No per diem will be paid during vacations, regardless of where vacation is spent. * * *
E. ALLOWABLE EXPENSES * * * 4. LIVING ALLOWANCES a. EMPLOYEE: $10 *155 per day throughout assignment, except during vacations, beginning with day of departure from home, from which lodging must be provided. Under McDonnell's contracts with the Air Force and its control procedures the United States Air Force and McDonnell agreed that the employees of McDonnell assigned for duty at testing facilities located away from the St. Louis plant would be initially assigned for a period not to exceed 9 months, but that subsequent extensions of this period could be made. Under these contracts and control procedures McDonnell was reimbursed by the Government for the $10 per diem living allowance paid employees transferred by McDonnell to Holloman. Beginning in May 1956 and until late 1958, McDonnell assigned a large number of its employees at St. Louis to Holloman to work on the F-101 and GAM-72. Substantially all of these employees were initially assigned for a period of 9 months and these assignments were renewed if the employee's services at Holloman were still required at the end of the 9-month period. At one time, over 300 McDonnell employees who had worked at St. Louis were assigned at Holloman. All employees who were assigned to Holloman from St. Louis *156 received $10 per diem living allowance while they were at Holloman. On January 2, 1957, McDonnell assigned petitioner to the project at Holloman. This assignment was occasioned by the request of certain engineers at Holloman who were dissatisfied with the fact that the Government photographic laboratory had spoiled certain film during its processing. McDonnell sent a precut photographic laboratory and equipment to Holloman for petitioner to assemble and use. Petitioner's initial Travel and Relocation Authority was dated December 28, 1956, and covered the period beginning January 2, 1957. It had under the space designated "To date" the word, "open". Petitioner originally went to Holloman by plane. He was furnished a plane ticket by McDonnell and given money by McDonnell for food and lodging and for rental of a car. About 3 weeks thereafter petitioner returned to St. Louis at the direction of his superior at McDonnell by plane using a ticket furnished by McDonnell. He remained in St. Louis for a short period and about February 1, 1957, returned by automobile to Holloman accompanied by his wife. Petitioner and his wife took their personal belongings with them. On the dates indicated, *157 McDonnell issued to petitioner Travel and Relocation Authorities and Interoffice Memos pertaining to his assignment to Holloman and extending his assignment, as follows: Period Covered
Document
No.
Date Executed
From
To
Travel and Relocation Authority
15280
12/28/56
1/ 2/57
Open
15280
8/ 7/57 *
1/ 2/57
1/25/57
15287
Not shown
1/26/57
5/26/57
15287
(Revised)
Not shown
1/26/57
5/26/57
15287
7/12/57
1/26/57
9/26/57
15287
Not shown
1/26/57
9/26/57
15287
3/ 7/58 *
Not shown
Not shown
15287
2/ 8/60 *
12/26/59
9/26/60
15287
11/22/60 **
3/29/60
12/ 2/60
Interoffice Memo
1323
9/27/57
9/26/57
6/26/58
1469
6/11/58
6/26/58
3/26/59
1642
2/ 9/59
3/26/59
12/26/59
1714
5/25/59
3/26/59
12/26/59
4883
2/ 4/60
12/26/59
9/26/60
On December 2, 1960, McDonnell transferred petitioner from Holloman to its plant in St. Louis. Petitioner's total wages or salary, the total amount of the $10 per diem living allowance, and the total amount received from McDonnell by petitioner *158 for the years 1957 and 1958 were as follows: Total $10 per Day
Year
Wages
Allowance
Total
1957
$5,262.53
$3,385.50
$ 8,648.03
1958
6,506.02
3,500.00
10,006.02
McDonnell required petitioner, and its other employees who were entitled to the per diem living allowance, to sign a travel expense report each week which reflected only the amount of $10 inserted on the form for each day of the period covered. During each week he was at Holloman in 1957 and until early 1958, petitioner signed such travel and expense reports. In early 1958 McDonnell discontinued use of the travel and expense reports and substituted therefor a weekly list which contained the names of all employees at Holloman during that particular week and the amount of per diem living allowance due to each. To receive his per diem allowance, petitioner was required to sign this list opposite his name. Prior to January 1, 1957, petitioner resided with his mother in St. Louis, Missouri, and his wife resided with her family in St. Louis, Missouri. In 1956 petitioner's wife was employed in St. Louis but quit her job to accompany petitioner to New Mexico upon his transfer to Holloman. *159 McDonnell leased housing near Alamogordo which it rented to its employees. After their move to Alamogordo petitioners occupied rented living quarters for about 1 year. Then, during January 1958, petitioner purchased a home in Alamogordo, New Mexico, and he and his family lived there until December 1960. Two children were born to petitioners during their stay in New Mexico. While employed by McDonnell in its St. Louis plant, petitioner was assigned to the photographic laboratory and worked as a photographer. While assigned at Holloman, petitioner set up a photographic laboratory at the testing base, was in charge of that laboratory, and also was McDonnell's photographer at Holloman in connection with its testing activities. Petitioner's superior was the Base Manager for McDonnell at Holloman. The photographic laboratory was part of this base facility operation. While at Holloman petitioner operated the photographic laboratory, took still pictures, black and white and color, operated the oscillograph machine and the motion picture processor, took movies, and performed a lot of copy work, as well as all the development. At first, petitioner performed all of the photographic and *160 development work for McDonnell at Holloman. Later, since the amount of testing performed by McDonnell at Holloman was increasing, McDonnell assigned assistants to petitioner who developed the film while petitioner took the pictures. While at Holloman petitioner worked on all the testing projects carried on there by McDonnell. There was no one with petitioner's training, knowledge, and experience available for local hire in the Alamogordo area who could have performed the duties which petitioner performed for McDonnell at Holloman. Petitioners on their 1957 income tax return included in their income under the designation "Per Diem McDonnell Aircraft Corp." the amount of $3,385.50 and deducted this same amount as "Spent on travel, meals and lodging away from home on employer's business." On their 1958 income tax returns petitioner did not include the $3,500 received from McDonnell as per diem allowance but in answer to the question, "Did you receive an expense allowance or reimbursement, or charge expenses to your employer?" checked the box opposite "Yes." Respondent in his notice of deficiency increased petitioners' income in the years 1957 and 1958 by the amounts of $3,385.50 and *161 $3,500, respectively, denominated, "Additional compensation" and in each of these years gave the following explanation: Your employer paid you a $3,385.50 [$3,500 in the year 1958] living expense allowance as an inducement to accept employment in New Mexico. This is considered additional compensation and is includible in gross income. Your employment in New Mexico is considered to be for an indefinite length of time and any living expense incurred while working there is a non-deductible personal expense. Opinion Petitioner's first contention is that the amounts received by him as per diem allowances are not includible in his gross income under Revenue Ruling 58-453, 1958-2 C.B. 67. Petitioner states that these amounts were per diem allowances in lieu of subsistence paid by an employer to his employee while in travel status which were not in excess of 125 percent of the maximum per diem rate authorized to be paid by the Federal Government in the locality in which the travel was performed, and, therefore, should be considered as amounts for which the employee would be deemed to have been required to account to his employer for the purposes of section 1.162-17(b), Income Tax Regs. *162 [1]Section 1.162-17(b), of respondent's Income Tax Regs. provides that the "employee need not report on his return (either itemized or in total amount) expenses for travel, transportation, entertainment, and similar purposes paid or incurred by him solely for the benefit of his employer for which he is required to account and does account to his employer * * *." This regulation is issued by the Commissioner under section 162 of the Internal Revenue Code of 1954[2] which provides that there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business including traveling expenses while away from home in the pursuit of a trade or business. Petitioner's argument with respect to Revenue Ruling 58-453, 1958-2 C.B. 67 shows a misconstruction of the basic issue here involved since this revenue ruling, as well as the regulation to which reference is made therein, deals with travel expenses which constitute deductions under section 162(a)(2) and in no way determines what are travel expenses under this provision of the Internal Revenue Code. The amounts received by petitioner *163 from McDonnell denominated "per diem allowance" totalling $3,385.50 and $3,500 in the years 1957 and 1958, respectively, are includible in petitioner's gross income under section 61 of the Code. Darrell Spear Courtney, 32 T.C. 334 (1959). *164 The question remains whether petitioners are entitled to deduct any part or all of the per diem allowances from their gross income under section 62(2)(B) which provides that a taxpayer is entitled to the deductions allowed by section 162(a)(2) for expenses of travel while away from home which such taxpayer incurred in connection with the performance of his duties as an employee. The Supreme Court in Commissioner v. Flowers, 326 U.S. 465 (1946), set forth three conditions which must be satisfied before a travel expense deduction is allowable. These conditions are that the expense must be a reasonable and necessary traveling expense, it must be incurred by a taxpayer while away from home, and the expense must be incurred in pursuit of business. Respondent in the instant case contends that petitioner is not entitled to any deduction for travel expenses since he has not satisfied the second condition set forth in Commissioner v. Flowrs, supra, in that he has failed to show that any amount of the expenses incurred by him in 1957 and 1958 in connection with his assignment during those years at Holloman was incurred "while away from home." Respondent contends that the word *165 "home" as used with respect to the deductibility of travel expenses means the taxpayer's principal place of business, with which contention we agree. Robert A. Coerver, 36 T.C. 252 (1960), affirmed per curiam 297 F. 2d 837 (C.A. 3, 1962). This brings us to the question whether petitioner's principal place of employment during the years 1957 and 1958 was Holloman Air Force Base. This Court and other courts have allowed a deduction for expenditures for travel including meals and lodging when a taxpayer's employment at the place where such expenditures are made is temporary as contrasted with indefinite or indeterminate. Peurifoy v. Commissioner, 358 U.S. 59, 61 (1958) and cases there cited. What constitutes "temporary" as distinguished from "indefinite" is a question of fact. In resolving this factual question, consideration has been given to whether the type of employment is such that its termination within a short time could be foreseen, Beatrice H. Albert, 13 T.C. 129 (1949), as well as to the actual duration of such employment. Floyd Garlock, 34 T.C. 611 (1960). In the instant case it is clear that although the *166 control procedure adopted by McDonnell with the approval of the contracting officer of the Government provided for an initial assignment for a 9-month period, it also provided for reassignments for additional 9-month periods without limitation as to the number of such reassignments. From this as well as McDonnell's practice in making reassignments of personnel to Holloman, we conclude that the 9-month assignment period had no relationship to the length of time that the individual so assigned might be stationed at Holloman. Petitioner's testimony herein gives no indication that he ever thought that his assignment to Holloman was for a short or temporary period as distinguished from a long or indefinite period after his return to St. Louis in late January 1957. His actions on his return to St. Louis at that time clearly indicate that he considered his transfer to Holloman to be for a long period of indefinite duration. His wife gave up her job in St. Louis to accompany him to New Mexico. Petitioner and his wife took their personal effects with them. They rented a house in New Mexico for about a year and then bought a house. Petitioner set up a photographic laboratory at Holloman which *167 was shipped to him from St. Louis. He was doing photographic work on any tests of McDonnell at Holloman when such work was needed. There were no persons available for employment in the area around Holloman with the technical skill which petitioner had in photographing armament tests. Petitioner relies primarily upon the case of Harvey v. Commissioner, 283 F. 2d 491 (C.A. 9, 1960), reversing 32 T.C. 1368 (1959). The facts in the instant case are distinguishable from those in Harvey v. Commissioner, supra. In the Harvey case when the taxpayer there involved was transferred to Edwards Air Force Base in December 1952, he did not move his family but in October 1953, in accordance with a plan looking towards his retirement, and also because of the long separation from his family, did move his family to the area of Edwards Air Force Base. The taxpayer's assignments were for 90-day periods. The time of the tests to which the taxpayer there involved was assigned ranged from a period of 2 months to as long as 1 year or 2 years, and the taxpayer there involved was actually at Edwards Air Force Base only a little over 1 year. These facts distinguish the *168 instant case from the Harvey case under the criteria suggested by the Circuit Court in that case that "An employee might be said to change his tax home if there is a reasonable probability known to him that he may be employed for a long period of time at his new station. What constitutes 'a long period of time' varies with circumstances surrounding each case." Respondent contends that the test set forth by the Circuit Court in Harvey v. Commissioner, supra, conflicts with decisions of this Court and with Peurifoy v. Commissioner, supra. Whether this test conflicts with the "temporary" as distinguished from "indefinite" test which has been used by this Court, James R. Whitaker, 24 T.C. 750 (1955), need not be decided herein. The facts here show both that petitioner's assignment to Holloman was indefinite and that there was a reasonable probability, known to him at the time of that assignment, that he might be employed at Holloman for a long period of time. He was there about 4 years. Decision will be entered for respondent. Footnotes
*. Issued as a correction. ↩
**. To increase allowance for dependents and allow towing trailer on return trip.↩
1. Sec. 1.162-17(b), Income Tax Regs.
(b) Expenses for which the employee is required to account to his employer - (1) Reimbursements equal to expenses. The employee need not report on his tax return (either itemized or in total amount) expenses for travel, transportation, entertainment, and similar purposes paid or incurred by him solely for the benefit of his employer for which he is required to account and does account to his employer and which are charged directly or indirectly to the employer (for example, through credit cards) or for which the employee is paid through advances, reimbursements, or otherwise, provided the total amount of such advances reimbursements, and charges is equal to such expenses. In such a case the taxpayer need only state in his return that the total of amounts charged directly or indirectly to his employer through credit cards or otherwise and received from the employer as advances or reimbursements did not exceed the ordinary and necessary business expenses paid or incurred by the employee. (2) Reimbursements in excess of expenses. In case the total of amounts charged directly or indirectly to the employer and received from the employer as advances, reimbursements, or otherwise, exceeds the ordinary and necessary business expenses paid or incurred by the employee and the employee is required to and does account to his employer for such expenses, the taxpayer must include such excess in income and state on his return that he has done so. ↩
2. All references are to the Internal Revenue Code of 1954 unless otherwise indicated. Sec. 162(a) IN GENERAL. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * *
(2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and * * *↩