Halsted Welles and Mildred Welles v. Commissioner.
Welles v. Commissioner
Docket No. 2969-62.
United States Tax Court
T.C. Memo 1965-249; 1965 Tax Ct. Memo LEXIS 80; 24 T.C.M. (CCH) 1338; T.C.M. (RIA) 65249; September 16, 1965
*80 Petitioner was employed as a writer in the Los Angeles, California, area by various film and teleplay producers in 1957 and 1958. His entire income in those years for writing services was derived from those California employers, and he worked in California almost continuously. Petitioner maintained his former home near New York City and his family remained there during part of 1957 and returned from California to New York in 1958. He deducted travel and away-from-home living expenses in his 1957 and 1958 income tax returns which were filed in Albany, New York, and respondent disallowed these deductions. Held: Petitioner's principal place of business and employment was California in 1957 and 1958, and the expenses he seeks to deduct were nondeductible personal expenses. Respondent's determinations sustained. Richard B. Jablow, for the petitioners. Lee A. Kamp, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: This proceeding is for redetermination of deficiencies in petitioners' income taxes for 1957 and 1958 in the respective amounts of $1,287.94 and $6,011.61. Respondent also determined a delinquency penalty of $280.57 for 1958 which petitioners do not *81 contest. The amounts said in the petition to be in controversy are $1,278.08 for 1957 and $5,761.60 for 1958. The principal question in issue is whether petitioners are entitled to the deduction of certain disallowed travel expenses incurred by petitioner, Halsted Welles, in travel between New York, N. Y. and Los Angeles, California, and of living expenses incurred during periods of time spent by him in Los Angeles during 1957 and 1958. Findings of Fact Some of the facts have been stipulated and are found accordingly. Halsted Welles, hereinafter called petitioner, his wife, Mildred Welles, being a party to this proceeding only by reason of having filed joint returns with him, resides at Nyack, New York. His returns for 1957 and 1958 were filed with the district director of internal revenue at Albany, New York, on May 19 and October 19, 1959, respectively. Petitioner is a writer by profession. He has been principally occupied, at all times here material, with writing, re-writing, and adapting literary material for radio, television, and motion pictures. After graduating from Yale University, petitioner taught English and Dramatics at Robert College, Istanbul, Turkey, for two years. *82 Thereafter he attended Yale University Drama School for three years and remained as an instructor there and director of the Yale Dramatic Association for five years. He also taught at Smith College as resident playwright for three years. He spent four years abroad visiting England, Europe, Russia, and the Near East. Petitioner's chief interest during that time was theatrical directing. He directed summer stock at Matunuck, Rhode Island, for three years, and over the 1936-1948 period directed several Broadway plays, including one which he himself had written. About 1948 petitioner decided to devote his entire time to writing. He had previously written a number of short stories for radio, television scripts, and plays for the legitimate stage. Some of his plays were produced on Broadway but petitioner's venture as a professional writer was for some years something less than a glowing financial success. In 1948 petitioner purchased a 6-acre tract of land at Nyack, New York, overlooking the Hudson River, and began the construction of a family residence thereon which he has since made his permanent family home. Petitioner and his wife personally have done much of the building work on the *83 residence, which at time of trial was still unfinished. Beginning in about 1953 there was a marked increase in television-film production originating on the West Coast and a resulting movement of that industry from New York to California. Following that movement petitioner began obtaining assignments from California producers for writing and adapting literary material for television screenplays. The three principal producers with whom petitioner obtained contracts during 1956 were: Screen Gems, Inc., Hollywood, California, a television subsidiary of Columbia Pictures; Bischoff-Diamond Enterprises, Los Angeles, California, an independent television producer; and The Associates & Aldrich Co., Los Angeles, California, an independent movie producer. Petitioner contracted with Revue Productions, Inc., on January 24, 1957, to re-write and polish a 30-minute television screenplay for total compensation of $1,500. In April of that year a further agreement was entered in which petitioner's services were engaged for writing an hour-length film teleplay. At this time Revue advised petitioner that they were preparing an agreement "whereby you are to render services as a writer in connection with *84 no less than ten assignments during the 52-week period commencing April 9, 1957, * * *" On April 22, 1957, a second employment agreement for an hour-length teleplay was made by Revue with petitioner. A further agreement dated June 5, 1957, was entered into in which petitioner was to furnish writing services for no less than ten assignments over a period of 52 consecutive weeks beginning April 9, 1957, for which he was to receive compensation for each separate story in amounts varying from $500 for a one-half hour "low budget" story to $3,750 for a one-hour "high budget" story and teleplay. A number of new agreements were entered into by petitioner and Revue Productions, Inc., or changes were made in the existing agreements in 1957 and 1958, and other contracts of employment with California teleplay producers were entered into with some degree of regularity by petitioner in those years. During 1957 petitioner performed services under employment contracts for five different California producers from whom he received compensation, as follows: Employers
Wages
Screen Gems, Inc., Hollywood, California
$ 2,052.75
The Associates & Aldrich, Co., Los Angeles, California
1,800.00
Revue Productions, Inc. North Hollywood, California
9,840.00
Wire Service, Inc., Hollywood, California
1,440.00
Loew's, Inc., M.G.M. Pictures, Culver City, California
12,500.00
Total
$27,632.75
*85 The amounts received from those producers were the only income reported by petitioner in his 1957 return. During 1958 petitioner received compensation from California producers in the following amounts: Employers
Compensation
Loew's Inc., M.G.M. Pictures Culver City, California
$44,500.00
Desilu Productions, Inc. Hollywood, California
3,000.00
Baroda Productions, Inc. Beverly Hills, California
5,500.00
Revue Productions, Inc. Studio City, California
6,052.75
Latimer Productions Company Studio City, California
1,500.00
Screen Gems, Inc. Hollywood, California
724.50
Total
$61,277.25 The only other income received and reported by petitioner in 1958 was the sum of $550 paid to him by California National Productions as residual fees (re-use payments) because of third and fourth runs of a film series on which petitioner had worked in 1955. Under his contract with M.G.M. dated July 17, 1957, petitioner was engaged to write a full and complete screenplay based on "The Tentacles," by Dana Lyon. His employment began July 22, 1957, and the play was completed December 20, 1957. Additional services were performed on the contract in January and February 1958. The time actually spent on this assignment was much *86 longer than contemplated by the parties. The usual time required for writing a complete screenplay is about ten weeks. The delay was caused principally by dissension and disagreement among the producers themselves and also between them and petitioner as to how the work should be done. Numerous conferences were held in which petitioner and one or more of the M.G.M. directors participated. Petitioner spent most of the year 1958 in writing for M.G.M. a full-length screenplay based on Edna Ferber's "Cimarron." Petitioner first prepared a "treatment" (outline) of the story which he began in February 1958, and completed in May of that year. He began writing the full story in July and completed the first draft about the last of October. The final draft was not completed until December 27 of that year. Again, as with "The Tentacles" contract, the delay was due to dissension among M.G.M. officials. At one point the head of the studio was "fired." An office and stenographic services were made available to petitioner by some of the producers, as was customary, but petitioner chose not to use them. He was never able to write satisfactorily in an office environment. All of petitioner's contracts *87 with the California producers required him to be available for conferences and consultations at the pleasure of his employers. They did not specify where petitioner would do his writing or require his presence in California during the terms of his employment, but they generally specified that petitioner's writing services would be performed wherever his employer might require. Petitioner made his first 1957 trip from New York to California on January 2, 1957, to discuss with an independent movie producer a re-write of a story which he had written and had published the year before. He returned to his Nyack home on February 3, 1957, and resumed his writing. He again visited California in March for interviews with the movie producers and returned to Nyack on April 2. Soon thereafter he visited London and Paris to discuss a moving picture to be produced in London. He also combined this trip with a vacation and pleasure trip and all told was out of the country about three months. He returned to California about July 21 and remained there at work on "The Tentacles" until December, except for a brief trip back to New York on November 20 to attend the National Council of the Writers Guild *88 of America. Petitioner spent almost the entire year 1958 in California at work on the "Cimarron" contract. He was on visits to New York from May 4 to May 18; August 13 to August 26; from September 23 to October 2; and from December 16 to December 31. He has since continued to spend most of his working time in California under much the same pattern. Most of petitioner's trips to and from New York and California were by airplane. His airplane fares amounted to $817.78 in 1957, and $1,065.95 in 1958. Petitioner claimed a deduction in 1957 of four taxi fares estimated at $20, from Nyack to the New York airport, and three taxi fares estimated at $6 per trip from Los Angeles to the airport. In 1958 he claimed a deduction of four taxi fares from Nyack to the airport, estimated at $20 a trip, and four taxi fares estimated at $6 per trip from Los Angeles to airport. Petitioner's wife and their two children joined him in California in August of 1957, and remained there until the following spring. The children attended school there. Petitioner and his wife first lived in a one-bedroom furnished apartment in the Gayley Terrace development in Los Angeles. They paid a rental of $80 per week. They *89 later moved to a one-bedroom apartment at the Westwood Apartments which they or petitioner occupied throughout 1958. The rental at the Westwood Apartments was $155 per month. Petitioner did not sign a lease on either of those apartments. The parties have stipulated that lodging expenses in California were incurred by petitioner during 1957 as follows: a. Ranuzzi Cottage
$ 90.00
b. San Carlos Hotel
46.50
c. Tropic Palms Hotel
94.00
d. Gayley Terrace Apartments at a rental of $80 a week for six weeks
480.00
e. Westwood Apartments at a rental of $155 per month for two months
310.00 They also have stipulated that for the year 1958 he incurred lodging expenses in California in the amount of $1,948.75 for the rental of an apartment at the Westwood Apartments for 12 months at $155 a month. [1]
While petitioner was living alone in Los Angeles he had most of his meals at restaurants. During the time his family was living in California with him they had most of their meals together at their apartment. In his 1957 return, petitioner claimed "Expenses of four trips to Los Angeles, Cal. necessary for business" in the amount of $5,070.10. In his 1958 *90 return he claimed "Away from home expenses-hotel-meals-etc." of $5,762.67 and "Travel-Airlines" of $1,403.25. Petitioner estimated the cost of his meals at $10 per day when alone and $35 per week when with his family (1/3 of the family budget of $75 per week plus lunches at $2 per day for a 5-day week). He kept no record of these expenses actually incurred. On August 2, 1957, in California, petitioner purchased an automobile, a 1956 Citroen, at a cost of $2,195, which he registered in the State of California. In his total for trips to Los Angeles or away from home expenses he included automobile expenses in the amounts of $836.77 in 1957, of which respondent allowed $301.86, and $1,808 in 1958 of which respondent allowed $636.21. He made no allocation in either year as between business use and personal use of the automobile. The parties have stipulated with respect to these automobile expenses claimed as deductions as follows: 1957 (a) Registration. Petitioners have no cancelled checks available for this item. Petitioners claim the California registration fee in the amount of $59.00 is a matter of public record. (b) Depreciation. The petitioners depreciated the aforementioned car *91 costing $2,195.00 at a rate of 25% per year resulting in an annual depreciation of $548.75. Petitioners claim 40% of the annual depreciation resulting in a claimed depreciation for the year 1957 in the amount of $219.50. (c) Repairs. Petitioners incurred repairs for the aforementioned car in the amount of $263.07. (d) Insurance. Petitioners paid $135.20 for insurance on the 1956 Citroen car. (e) Parking. Petitioners paid $25.00 as parking expense. (f) Gas and Oil. Petitioners claim $135.00 as expenses for gas and oil. This amount was computed on the basis of approximately 3,000 miles for business purposes in California at a cost per mile estimate of 4 1/2 cents per mile. 1958 (a) Automobile Club of California. Petitioner paid $105.50 to the Automobile Club of California, which included his vehicle registration. (b) Gas and Oil. Petitioners claim gas and oil expenses in the amount of $675.00. Petitioners estimated this amount on the basis of approximately 15,000 miles for business purposes in California at a cost per mile estimate of 4 1/2 cents per mile. (c) Car Insurance. Petitioners paid $264.50 for car insurance on the 1956 Citroen. (d) Depreciation. Depreciation was computed *92 on a 25% rate per annum for an annual depreciation of $548.75 of which petitioners have taken 5/6ths of the aforementioned annual depreciation representing the proportionate time claimed to have been spent in California for business purposes which totals $457.50. (e) Repairs. Petitioners paid $481.22 for repairs on the 1956 Citroen. By stipulation the parties also agree to the following concessions: Petitioners will concede telephone expenses in the amount of $35.00 previously claimed on their 1957 return and disallowed in the statutory notice of deficiency. For the year 1958 petitioners will concede telephone expenses in the amount of $500.00 previously claimed on their 1958 return and disallowed in the statutory notice of deficiency. Petitioners will concede the entertainment expenses and gifts in the amount of $1,500.00 claimed on their 1958 return and disallowed in the statutory notice of deficiency. Following is a partial list of expense deductions claimed by petitioner and disallowed, in part or in whole, by respondent in each of the years 1957 and 1958: Claimed
Allowed
Disallowed
1957
1958
1957
1958
1957
1958
Fares
$ 915.78
$1,403.25
None
None
$ 915.78 [1] *93 $1,403.25 [1]
Meals
1,320.00
3,813.92
None
None
1,320.00 [1]
3,813.92 [1]
Lodging
1,050.18
1,948.75
None
None
1,050.18 [1]
1,948.75 [1]
Laundry
87.00
None
87.00 [1]
expense
Automobile
841.77
1,808.00
$301.86
$636.21
539.91 [2]
1,171.79 [2]
expenses
Telephone
110.36
1,285.27
75.36
785.27
35.00 [2]
500.00 [2] During 1957 and 1958 petitioner was a member, and president, of the Writers Guild of America. The Guild is divided into two sections - one for the East (east of the Mississippi River), and one for the West. When a member writer moves from one section to the other and remains there for a period of three months, he is required to change his membership to the new section. Petitioner's membership was in the East section and was never transferred to the West. There were other claimed deductions in petitioner's returns which have been allowed or disallowed in part or in whole and are not here in controversy. Finding of Ultimate Fact Petitioner's principal place of business and employment was in the Los Angeles, California area during 1957 and 1958. Opinion The principal question in issue here is whether *94 during 1957 and 1958 petitioner was "away from home" and entitled to the expense deductions claimed under section 162(a) of the Internal Revenue Code, for travel, lodging, and meals. Petitioner's contentions are that his residence in Nyack, New York, remained his home for "tax and all other purposes" throughout 1957 and 1958, and that while visiting in California he was away from home in connection with his profession. The parties seem to be in agreement that the deductions claimed are allowable, at least in part, if petitioner's tax home was in New York, as he contends. A stipulation has been submitted setting forth the amounts actually expended by petitioner for transportation and lodging in 1957 and 1958, and petitioner's estimates for taxi fares to and from airports in New York and Los Angeles. The evidence leaves no doubt that petitioner meant to keep his permanent home in Nyack and not to change it to Los Angeles, at least in 1957 and 1958. That alone, however, does not satisfy the statute. "Home" as used in the statutory phrase "away from home" is construed as meaning a taxpayer's "place of business, employment, or post or station at which he is employed." Raymond E. Kershner, 14 T.C. 168 (1950); *95 James R. Whitaker, 24 T.C. 750 (1955). In the Whitaker case we said, at page 753: But questions with reference to the meaning of "home" as used in the section of the Code referred to are not so easily answered. In Raymond E. Kershner, 14 T.C. 168, we said at page 174, "For the purposes of the statute, a taxpayer's home means his place of business, employment, or post or station at which he is employed." This, of course, must depend upon more than the mere fact that the taxpayer or his employer "considered" such and such a place to be the employee's principal place of business or employment or his home. The ultimate fact must depend upon all the evidence of record in the light of the statutory language. We further said: The proper conclusion becomes more difficult where the taxpayer, as here, travels from place to place during the taxable year in pursuit of his business or that of his employer. In cases of this type we have held that a distinction is to be made whether the employment is of a "temporary" or "indefinite" duration at a particular place. Beatrice H. Albert, 13 T.C. 129. Whether petitioner's employment in California was temporary, permanent, or of an indefinite duration *96 depends not so much on the actual length of time of his employment there as on other factors, such as the nature and circumstances of his employment and its reasonably expected duration. Petitioner's reliance on Harvey v. Commissioner, 283 F. 2d 491 (C. A. 9, 1960), reversing 32 T.C. 1368, is misplaced. There the taxpayer, an employee of Douglas Aircraft Company, was transferred from the Company's plant at Santa Monica to Edwards Air Force Base in December 1952, and worked there until the end of 1954. The Court held that he was "away from home" and entitled to deduct the cost of meals and lodging expenses incurred while stationed at the air base. The Court there said (at page 495): It is not reasonable to expect the employee to dispose of his home every time the requirements of his employer's business necessitate his being away for an indefinite period of a few weeks or a few months; hence a special deduction is allowed to mitigate the burden which this taxpayer carries. * * * An employee might be said to change his tax home if there is a reasonable probability known to him that he may be employed for a long period of time at his new station. What constitutes "a *97 long period of time" varies with circumstances surrounding each case. If such be the case, it is reasonable to expect him to move his permanent abode to his new station, and thus avoid the double burden that the Congress intended to mitigate. On the other hand, if it is very likely that taxpayer's stay away from home will be short; then it seems quite unreasonable to expect him to move his domicile, even though it cannot be said that his employment will terminate "within a fixed or reasonably short period," to use the words of the Tax Court. The circumstances of the case at bar illustrate the application of the test here suggested. When taxpayer went to Edwards it could not be said that his employment there would end within a fixed period. His employment was "indefinite" in that sense, but it was also very likely - not certain, but quite probable - that his employment at Edwards would be relatively short. * * * We think the facts presented here make this case readily distinguishable from those before the Court in the Harvey case. Petitioner's employment in California was indefinite. All of his contracts were job contracts and, except for the 52-week Revue contract, were not for any *98 fixed term, although obviously some were for extended periods. It was well known to petitioner and to professional writers generally that a writer's assignment for work in the motion picture or television production industry, however favorably contrived, carries but little assurance of permanency. According to the testimony of Evelyn F. Burkey, executive director of the Writers Guild of America, East, petitioner was not too well known as a writer and was not one of the few Hollywood writers who could "write their own ticket." However, it was certainly known to petitioner in April of 1957 that Revenue Productions, at least, was going to employ him for a period of 52 consecutive weeks to write at least ten assignments. Contracts for two hour-length teleplays were entered into between petitioner and Revenue that month. Other substantial writing employment contracts in California followed in a short period of time. Petitioner derived all of his income in both 1957 and 1958, for writing done in those years, from California producers as an employee of those producers. He spent increasingly long periods of time there. He had no business office and no source of income in New York, and while *99 he did have a New York business agent, the agent also had offices in Los Angeles. Petitioner contends that he was free to do his writing in New York but the evidence is not that he did so, and, to the contrary, petitioner's employment contracts provided that he would perform his writing services wherever his employer might direct. The record shows that substantially all of his work on the California contracts was performed in California, and because of the contract provisions with respect to consultations, conferences, attendance at meetings, services to be rendered "on location" et cetera, it was clearly contemplated that petitioner's services for his California employers in 1957 and 1958 were to be rendered in the Los Angeles, California, area. His 52-week contract made with Revue Productions in April of 1957 even provided that if that employer required petitioner "to render services at any place other than Los Angeles or vicinity, then Writer will be reimbursed by the Corporation for reasonable out-of-pocket living expenses while so required to be absent from Los Angeles" and also first-class transportation from Los Angeles "to such other place and return." By August of 1957 it *100 was so apparent to petitioner that he would be continuing to work in California that he moved his family to the Los Angeles area and enrolled his children in school there. On all of the facts presented by the record before us, we can only conclude that petitioner's principal and in fact only place of employment in 1957 and 1958 was California and that there was a reasonable probability known to petitioner early in 1957 that he would be profitably employed writing teleplays in California for a long period of time, and probably indefinitely. Some of the authorities seem to lend support to petitioner's contentions here. The cases were reviewed at length in Wright v. Hartsell, 305 F. 2d 221 (C.A. 9, 1962), and in summary the Court said, at page 224: Where it appears probable that a taxpayer's employment outside the area of his regular abode will be for a "temporary" or "short" period of time, then his travel expenses are held to be deductible; conversely, if the prospects are that his work will continue for an "indefinite" or "intermediate" or "substantially long" period, then the deduction is disallowed. Compare Burns v. Gray, 287 F. 2d 698 (6th Cir. 1961); Claunch v. Commissioner, 264 F. 2d 309 (5th Cir. 1959); *101 Commissioner v. Peurifoy, 254 F. 2d 483 (4th Cir. 1957), aff'd, 358 U.S. 59, 79 S. Ct. 104, 3 L. Ed. 2d 30 (1958), with Harvey v. Commissioner, supra. * * * However, on the basis of the facts of this case the weight of the cases is with respondent. There is lacking proof here that petitioner's employment in Los Angeles in 1957 and 1958 was temporary or for a short period of time. On the other hand, the indications were that it might continue indefinitely, depending on the acceptability of petitioner's work to the producers. In 1957 it became readily apparent that petitioner's writing was acceptable and that he would continue writing for California teleplay producers. There were no requirements in petitioner's employment for him to continue his residence in New York. For all that is shown, this was a matter of his own choice for his own personal satisfaction. Petitioner's undisputed right to make such a choice does not lessen the force of the statute. The deduction is allowed only where the travel to and from the place of employment is motivated by the "exigencies of business rather than the personal conveniences and necessities" of the taxpayer. Flowers v. Commissioner, 326 U.S. 465 (1946). *102 We think that on the entire record before us respondent properly disallowed petitioner's deduction of travel expenses to and from New York and California, as well as the cost of lodging and meals and other incidental personal expenses incurred in California. On the evidence before us we can only conclude that in 1957 and 1958 petitioner was not just temporarily away from home but rather that his principal place of business and employment, his tax "home" was in California, not in New York. Barnhill v. Commissioner, 148 F. 2d 913 (C.A. 4, 1945), affirming a Memorandum Opinion of this Court; William Lee Tracy, 39 B.T.A. 578 (1939). His expenses for meals and lodging, and his travel back and forth to see his family, which remained in New York part of the time, were therefore personal and not deductible from gross income. Our holding disposes of all of the issues raised except the automobile expenses. Petitioner claimed expenses in the amounts of $841.77 in 1957 and $1,808 in 1958, which respondent allowed in the amounts of $301.86 and $636.21, respectively. Respondent's partial allowance presumably is based on an allocation between business and pleasure use of the automobile. In any *103 event, the record contains no evidence in regard to the use of the automobile or the amounts of expenses actually incurred by petitioner for business purposes. For lack of evidence of error respondent's determination, which is presumptively correct, must therefore be sustained. Decision will be entered under Rule 50. Footnotes
1. The apparent discrepancy in these figures is not explained.↩
1. These items are disallowed for the reason that such expenses do not constitute allowable deductions under the provisions of section 162(a)↩ or any other section of the Internal Revenue Code of 1954. 2. These items are disallowed for the reason that to such extent they do not constitute ordinary and necessary business expenses within the purview of section 162(a) of the Internal Revenue Code of 1954↩.