GREGORY L. DEBLOCK AND KYUNG B. DEBLOCK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Deblock v. Commissioner
Docket No. 10003-75.
United States Tax Court
T.C. Memo 1980-277; 1980 Tax Ct. Memo LEXIS 314; 40 T.C.M. (CCH) 774; T.C.M. (RIA) 80277; July 28, 1980, Filed; As Amended July 30, 1980 *314 Petitioners lived in Portland, Oregon. From April 12, 1972, to July 1975, petitioner-husband was employed by a subcontractor at the construction site of a nuclear power plant at Rainier, Oregon, 45 miles from Portland. From July to December 1975, he was employed by another subcontractor at the same site. He drove from his Portland home to the construction site and back each working day. Held: Petitioner-husband's employment at the Rainier job site was not temporary during 1972 and 1973; his daily transportation expenses are not deductible under section 162(a). Donald H. Burnett and I. Franklin Hunsaker, for the petitioners. Jan R. Pierce, for the respondent. CHABOT
MEMORANDUM OPINION CHABOT, Judge: * *315 Respondent determined deficiencies in Federal individual income tax against petitioners for 1972 and 1973, in the amounts of $448.17 and $650.83, respectively. The issue for decision is whether petitioners may deduct under section 162(a) [1] automobile expenses incurred by petitioner, Gregory L. Deblock, in traveling each working day between his residence and his place of employment. [2] The case was submitted on the pleadings and a stipulation of facts; the stipulation *316 and the stipulated exhibits are incorporated herein by this reference. [3]
When the petition in this case was filed, petitioners, Gregory L. Deblock (hereinafter sometimes referred to as "Gregory") and Kyung B. Deblock (hereinafter sometimes referred to as "Kyung"), husband and wife, resided in Portland, Oregon. The Trojan nuclear power plant is located at Rainier, Oregon, some 45 miles from Portland, Oregon. The plant was designed to generate electricity for three area power companies (Portland General Electric, Pacific Power & Light, and Eugene Water & Electric Board). Construction on the plant was begun in February 1971 and was slated to be completed in late 1975. The initial generation of power *317 from the plant actually began on December 22, 1975. One of the primary subcontractors on the construction of the plant was Wright-Schuchart-Harbor Construction Co. (hereinafter referred to as "WSH"), of Seattle, Washington. WSH, a plumbing subcontractor, employed steamfitters on the construction of the plant from July 18 1971, through December 1975. WSH had contracts which covered the bulk of the piping work on the construction of the plant. WSH's employment at the site averaged about 300, reaching a maximum of about 550 in July 1974. About 70 percent of WSH's employees were steamfitters. Steamfitters working on the project were dispatched through Local No. 235, Steam and Marine Fitters Union (hereinafter referred to as "the Union"), and employment was on a day-to-day basis. Gregory first worked as a steamfitter at the Trojan plant site for WSH in September 1971 for less than one month, after which his employment was terminated by WSH because of a large reduction in the work force. He returned to work as a steamfitter with WSH at the Trojan plant site on April 12, 1972, and worked until July 1975. From July 1975 through December 1975, Gregory was employed at the Trojan plant *318 site by Jelco, another subcontractor. During 1972 and 1973 petitioners resided at the home they owned in Portland. Gregory made a round trip from this home to the Trojan plant site--a total distance of 92 miles--every working day during 1972 and 1973 that he was employed by WSH. In this manner, Gregory drove approximately 16,000 miles in 1972 and 20,000 miles in 1973. During 1972 and 1973, Gregory was a member of the Union. All of Gregory's employment (as well as the employment of the other steamfitters) at the Trojan plant site was subject to the Union's contracts with the Portland Plumbing, Heating, and Cooling Association (hereinafter referred to as "the Association"). The contract between the Union and the Association provided for employers to pay travel allowances for work a specified distance away from City Hall in Portland, following an almost universal pattern in construction union contracts in the Pacific Northwest. The contract between the Union and the Association set up a series of concerntric travel zones, like the rings of a target, for work in which travel allowances were paid. A ten-mile radius from City Hall in Portland (the bullseye of the target) constituted *319 the "free zone". If travel was within the Free zone, no travel allowance was provided. The Trojan plant site was 45 miles from City Hall, in zone 4. The zone 4 daily allowance was $9 per day, plus one round-trip bus fare per week. All workers under the contract received the same travel allowance regardless of where they traveled from, or whether they traveled in a car pool or bus, or whether they drove their own automobiles. The workers received no other travel or mileage allowance and they were not paid for travel time. Table 1 shows the average length of employment of WSH's employees who were working on the Trojan project in July and August of 1975: Table 1 Length of
Percentage of
Employment
Employees
0-3 months
29.6
3-6 months
20.1
6-12 months
24.7
12 months or over
25.5
Table 2 shows the average employment period for those who had worked as WSH employees on the Trojan project at some time but who were not so employed as of July or August 1975: Table 2 Length of
Percentage of
Employment
Employees
0-3 months
64.6
3-6 months
13.2
6-12 months
13.8
12 months or over
8.5 Table 2 is based on a sampling of records. At a 90-percent confidence level, the percentages are accurate to plus or minus 4 percent. *320 During the time that construction was being carried on at the Trojan plant site, there were not enough steamfitters on the Union's rolls to handle both the regular work in the Portland area and the Trojan project work. Accordingly, many journeymen steamfitters from other parts of the Nation (hereinafter sometimes referred to as "travelers") came to work in the Portland area. These travelers were issued temporary cards by the Union while retaining membership in their home locals. At the peak of the work at the Trojan plant site, the majority of the steamfitters were travelers. Under the contract between the Union and the Association, a Union member had to have been a permanent resident within the territorital "jurisdiction" of the Union for at least two years in order to be on the "A" list. The "B" list included all other Union members residing in Oregon. The "C" list included all Union members not on the "A" list or the "B" list. With certain specified exceptions, "C" list employees were to be laid off before "B" list employees, and "B" list employees were to be laid off before "A" list employees. During the years before the Court, available housing at or near the Trojan plant *321 site was very limited. During the period 1970-1974, the county in which the Trojan plant is located (Columbia County) had a severe housing problem characterized by low vacancy rates; it was the most residentially-blighted county in or immediately adjacent to the Portland metropolitan area. Rainier, Oregon, the town closest to the Trojan plant site, had a population of 1,731 in the 1970 census. There was substantially no rental housing available in Rainier from 1971 through 1975 for the 1,400 or so workers at the Trojan plant site. Other towns relatively close to the Trojan plant site are Longview, Washington (7 miles from the site, 1970 population of 28,373), St. Helens, Oregon (14 miles from the site, 1970 population of 6,212), and Scappoose, Oregon (more than 20 miles from the site). Gregory's employers did not provide housing at the site. There was no direct public transportation from any of these towns to the Trojan plant site. A bus from Portland stopped about 1/4 mile from the Trojan plant site, but did not run at times coincident with shift changes. When Gregory returned to his employment with WSH at the Trojan plant site, on April 12, 1972, his immediate supervisor estimated *322 that work with WSH could last through early 1974. However, Gregory was not guaranteed a specified length of employment; his employment was on a day-to-day basis and was subject to termination at any time. In the early part of Gregory's employment with WSH, he worked on organizing a supply and layout building, part of which time he was a foreman. Thereafter, he worked on the plant structures themselves. At oe point in this period, he was promoted to foreman in that work, but was later demoted back to journeyman. Gregory did not look extensively in the small communities around Rainier for housing as he believed it would be impractical for his family to move in view of the small amount of available housing and the strain a move would put on the family finances. Kyung would have had to give up her employment, or commute herself without any subsistence allowance to offset the cost. During the period Gregory was employed at the Trojan plant site, he believed the construction industry in the Portland area was depressed. He believed that if the Trojan plant had not been under construction, there would have been increased competition for jobs in the Portland area. Gregory did not actively *323 seek other employment while working at the Trojan plant site. However, if fairly steady employment for which he was qualified had been available closer to Portland, he would have accepted it. He was confident that he would have become aware of any such employment opportunities through the Union if there were any. Gregory made no commitment to WSH regarding length of employment at the Trojan plant site. Gregory has lived in Portland nearly all his life, except for military service. Gregory and Kyung were married in 1961. During 1972 and 1973, petitioners owned their own home in northern Portland, paid real estate taxes there, and voted there. They have two children, both of whom attended school during the period Gregory worked at the Trojan plant site. In March of 1973, Kyung began working as a repair person at the Western Electric repair facility in Portland. She believed there were no jobs of a comparable nature available in the immediate area of the Trojan plant site and that she would have had difficulty in securing other types of employment at the Trojan plant site because of her limited ability to speak the English language. Kyung would not have been able to maintain her *324 position with Western Electric if she had taken a leave of absence from her job while Gregory worked at the Trojan plant site. Petitioners included in income the travel allowances received by Gregory from WSH--$1,617 in 1972 and $2,308 in 1973. From the amounts of these allowances, petitioners deducted $2,016 for 1972 and $2,229 for 1973, as Gregory's automobile expenses (computed on a standard mileage basis) incurred in his workday round trips between petitioners' home in Portland and Gregory's workplaces at the Trojan plant site. The parties do not dispute the includibility of the travel allowances received by Gregory from WSH (see Coombs v. Commissioner,608 F.2d 1269, 1272 (CA9 1979), affg. in part and revg. in part 67 T.C. 426, 469-472 (1976)), nor do they dispute the amounts of Gregory's automobile expenses attributable to his workday round trips. The issue we face is the deductibility of these automobile expenses. Petitioners maintain that the cost of Gregory's automobile expenses for his workday round trips to the Trojan plant site are deductible under section 162(a) as ordinary and necessary expenses of Gregory's trade or business because (1) Gregory's job at the site was *325 temporary rather than indefinite, (2) the site was "at a remote location, with limited housing and public transportation", and (3) petitioners constituted a two-job family, with Kyung "working at an established job in the locality of the permanent residence". Respondent asserts that the "expenses incurred by [Gregory] in commuting" [6] are personal expenses which are not deductible because of section 262, and that Gregory's job at the site was indefinite. We agree with respondent that the automobile expenses are not deductible because they are personal expenses (sec. 262) and are not ordinary and necessary expenses of Gregory's trade or business (sec. 162(a)). Personal expenses are not deductible, unless the contrary is "expressly provided" in chapter 1 of the Internal Revenue Code of 1954 (sec. 262). [7] The transportation expenses ordinarily incurred in going between one's *326 abode and one's place of business are nondeductible personal expenses under section 262. Fausner v. Commissioner,413 U.S. 838 (1973); Commissioner v. Flowers,326 U.S. 465 (1946); section 1.262-1(b)(5), Income Tax Regs. Section 162(a) expressly provided for the deduction of all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. [8] *327 Generally, for transportation expenses to be deductible as expenses incurred in pursuit of business, "[the] exigencies of business rather than the personal conveniences and necessities of the traveler must be the motivating factors." Commissioner v. Flowers,326 U.S. at 474.
Petitioners concede that Gregory's transportation expenses are not deductible under section 162(a)(2) as traveling expenses while away from home, since Gregory has not satisfied the requirements of the "overnight" rule. United States v. Correll,389 U.S. 299 (1967). See Coombs v. Commissioner,608 F.2d at 1276-1277. They assert, instead, that the amount is deductible as an ordinary and necessary business expense under the "lead-in language" of section 162(a). An exception has been developed to the general rule that "home" as used in section 162(a)(2) means the vicinity of the taxpayer's principal place of employment and not where his or her personal residence is located. Under this exception, a taxpayer's personal residence may be his or her "tax home", and the taxpayer's absence from that home may give rise to an ordinary and necessary expense of the taxpayer's trade or business if the taxpayer's principal place of business is "temporary", rather than "indefinite". See Peurifoy v. Commissioner,358 U.S. 59, 60 (1958). This exception *328 is relevant to section 162(a)(2) cases and not to general section 162(a) cases. Turner v. Commissioner,56 T.C. 27 (1971), vacated and remanded on respondent's motion in an unpublished order (CA2 1972). See Coombs v. Commissioner,608 F.2d at 1276, n. 3. Nevertheless, the parties herein have framed their dispute largely in terms of whether Gregory's work at the Trojan plant site during the years before the Court was "temporary", or "indefinite", within the meaning of the Peurifoy exception. Under this Peurifoy exception, a place of business is a "temporary" place of business if the employment is such that "termination within a short period could be foreseen." Albert v. Commissioner,13 T.C. 129, 131 (1949). See Michaels v. Commissioner,53 T.C. 269, 273 (1969). Or, viewed from the other side of the coin, an employment is for an "indefinite", "substantial", or "indeterminate" period of time if "its termination cannot be foreseen within a fixed or reasonably short period of time." Stricker v. Commissioner,54 T.C. 355, 361 (1970), affd. 438 F.2d 1216 (CA6 1971). "Further, if the employment while away from home, even if temporary in its inception, becomes substantial, indefinite, *329 or indeterminate in duration, the situs of such employment for purposes of the statute becomes the taxpayer's home." Kroll v. Commissioner,49 T.C. 557, 562 (1968). These are questions of fact ( Peurifoy v. Commissioner,358 U.S. at 60-61), as to which petitioners have the burden of proof ( Daly v. Commissioner,72 T.C. 190, 197 (1979)). The primary factors pointing toward petitioners' position that the employment was "temporary" are the day-to-day nature of the employment with no commitment by Gregory to WSH and none by WSH to Gregory, and the shifting nature of Gregory's work (organizing a supply and layout building, working on plant structures, in each case being a foreman part of the time and a journeyman part of the time). The primary factors pointing toward respondent's position that the employment was "indefinite" are WSH's contracts covering the bulk of the piping work, Gregory's preferred status in the event of layoffs (as compared to the many "travelers" on the project), Gregory's immediate supervisor estimating the April 1972 that work with WSH could last through early 1974, Gregory's belief that it would be difficult to find work in the Portland area, and Gregory's total *330 employment at the site lasting about 44 months (39 months with WSH and five with Jelco).
On balance, the evidence in this record leads us to conclude that Gregory did not foresee termination of his employment at the Trojan plant site "within a short period" at any time during the years before the Court. We conclude that the Peurifoy "temporary" rule does not apply to this employment. See McCallister v. Commissioner,70 T.C. 505 (1978); Norwood v. Commissioner,66 T.C. 467 (1976). See also Blatnick v. Commissioner,56 T.C. 1344 (1971). The Court of Appeals for the Ninth Circuit has established its own approach to the Peurifoy "temporary" exception. See Mitchell v. Commissioner, 74 T.C.     (June 16, 1980). In Harvey v. Commissioner,283 F.2d 491 (CA9 1960), revg. 32 T.C. 1368 (1959), the Court of Appeals set forth its rule as follows: An employee might be said to change his tax home if there is a reasonable probability known to him that he may be employed for a long period of time at his new station. What constitutes "a long period of time" varies with circumstances surrounding each case. If such be the case, it is reasonable to expect him to move his permanent abode to his new *331 station, and thus avoid the double burden that the Congress intended to mitigate. * * * [283 F.2d at 495; emphasis in original.] In Wills v. Commissioner,411 F.2d 537, 541 (CA9 1969), affg. 48 T.C. 308 (1967), the Court of Appeals summarized the foregoing Harvey rule; it then distinguished Harvey as a holding "that the particular taxpayer had not changed his tax home [i.e., that his new employment was not temporary] where employment at the new station normally lasted only a few months." See Doyle v. Commissioner,354 F.2d 480 (CA9 1966), affg. a Memorandum Opinion of this Court, [9] in which the Court of Appeals indicated that a 28-month period was sufficiently long to satisfy the Harvey "long period of time" test (354 F.2d at 482) and suggested that nine months might be an appropriate general dividing line (354 F.2d at 483, n. 3). See Stricker v. Commissioner,54 T.C. at 362. See also Marth v. Commissioner,342 F.2d 417 (CA9 1965), affg. per curiam a Memorandum Opinion of this Court. [10]
Weighing the same elements as set forth above we conclude that, at the start of Gregory's employment in 1972, he could reasonably expect his employment *332 to last "a long period of time"; that under the Harvey test, Greory accepted employment for an indefinite time away from the place of his usual abode; and that his decision to retain his home at Portland was a personal choice, and his travel expenses between Portland and the Trojan plant site are not deductible. [11]
Petitioners' primary reliance on our opinion in Norwood v. Commissioner,supra, is misplaced. When Gregory returned to work for WSH in April 1972, he was in a position similar to that faced by Mr. Norwood when the latter was kept on as a foreman after the completion of the latter's first, five-month, *333 job. See Norwood v. Commissioner,66 T.C. at 470, and the cases cited therein. The fact that Kyung secured outside employment in Portland in 1973 does not affect the deductibility of Gregory's expenses for 1972 or 1973. Mitchell v. Commissioner, 74 T.C. at    ; Daly v. Commissioner,72 T.C. at 196; Foote v. Commissioner,67 T.C. 1, 6-7 (1976); Tucker v. Commissioner,55 T.C. 783, 788 (1971). The remoteness of the Trojan plant site does not make Gregory's daily round trip expenses deductible. Coombs v. Commissioner,608 F.2d at 1276; Sanders v. Commissioner,439 F.2d 296, 299 (CA9 1971), and cases there discussed, affg. 52 T.C. 964 (1969). On the only issue presented for decision, we hold for respondent. To take account of the medical expense deduction adjustments (see note 2, supra), Decision will be entered under Rule 155.
Footnotes
*. By order dated August 1, 1978, the Chief Judge reassigned this case from Judge William M. Fayto Judge Herbert L. Chabot↩ for disposition. 1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable years in issue. ↩
2. Respondent's proposed adjustments decreasing the amount of petitioners' medical expense deductions are not explained in the statements accompanying the notice of deficiency. They appear to be solely derivative; that is, they appear to be in the amounts that would result from recomputation of the three-percent "floor" (sec. 213(a)(1)) that would be required by a holding for respondent on the "above-the-line" automobile expense issue. However, the proposed 1972 medical expense deduction adjustment ($60.48), exceeds petitioners' claimed 1972 medical expense deduction ($37). Also, respondent proposed to reduce petitioners' 1973 medical expense deduction by $66.87, even though petitioners claimed no medical expense deduction for 1973. In view of our decision on the automobile expense issue, the treatment of the proposed medical expense deduction adjustments will be resolved in the computation under Rule 155.↩
3. The parties have stipulated to what twelve individuals would have testified to if they had been called as witnesses in the instant case. Respondent objects to substantially all of this "testimony" (and, presumably, to the seven exhibits attached thereto) "on the grounds that it is irrelevant and immaterial to any issue in this case." We conclude that the stipulated "testimony" and exhibits are relevant and they are received into evidence. Rules 401 and 402, Federal Rules of Evidence.↩
6. The term "commuting" is little more than a shorthand for "nondeductible"; especially in the context of the way the parties herein have framed the issue, "commuting" is a label that does not appreciably advance the logical analysis of the situation. See United States v. Tauferner,407 F.2d 243, 245↩ (CA10 1969).
7. SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES. Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses. ↩
8. Section 162(a) provides, in relevant part, as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- * * *
(2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; * * *
9. T.C. Memo. 1964-110↩. 10. T.C. Memo. 1964-116↩.
11. See Coombs v. Commissioner,608 F.2d at 1275-1276, where the Court of Appeals set forth its analysis as follows: In addition, when a taxpayer accepts employment either permanently or for an indefinite time away from the place of his usual abode, the taxpayer's tax home will shift to the new location--the vicinity of the taxpayer's new principal place of business. * * * In such circumstances, the decision to retain a former residence is a personal choice, and the expenses of traveling to and from that residence are non-deductible personal expenses. * * * [Citations omitted.]↩